**PRACTICE PERFECT, INC., Plaintiff,**

v.

**HAMILTON COUNTY PHARMACEUTICAL ASSOC., et al., Defendants.**

**No. C–1–87–228.**

United States District Court,
S.D. Ohio, W.D.

Oct. 3, 1989.

Kenneth G. Hawley, Cincinnati, Ohio, for plaintiff.

Alan C. Witten, Columbus, Ohio, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SPIEGEL, District Judge.

The plaintiff, Practice Perfect, Inc., brought this law suit against the Hamilton County Pharmaceutical Association, its president, and several of its trustees. The plaintiff's complaint alleges violations of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2), section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), and various provisions of state statutory and common law. This matter is before the Court on defendants' motion for summary judgment on all counts of the complaint (doc. 25), the plaintiff's memorandum in opposition (doc. 31), and the defendants' reply (doc. 32). The defendants presented a number of grounds on which they argue they should be granted summary judgment, including the ground that the plaintiff after extensive discovery has failed to show that it suffered any injury as the result of the alleged wrongful acts of the defendants. This Court concludes that the plaintiff sustained no injury attributable to the actions of the defendants, and therefore is not entitled to the requested relief under either of its federal causes of action. Furthermore, upon the dismissal of both of the plaintiff's federal causes of action, this Court declines to retain jurisdiction over the plaintiff's state claims and dismisses those claims without prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Practice Perfect, Inc., was incorporated in October of 1986 for the purpose of entering the business of prescription drug repackaging. Practice Perfect was formed by Joseph Thomas, Vincent Stitzel, Thomas Klocke, Richard Kugele, and William Richter, all of whom are pharmacists employed at the Veterans Administration Hospital in Cincinnati, Ohio. Practice Perfect planned to purchase drugs from a wholesaler, repackage them into standard dosage units, affix the appropriate labels, and then stock the drugs in the offices of physicians. The physicians would then dispense the drugs directly to their patients. The physicians would pay Practice Perfect two dollars above the wholesale cost for each repackaged item dispensed, and would be free to charge patients whatever price they wished.

By December of 1986, the plaintiff had obtained from the state of Ohio a license as

a wholesale distributor of dangerous drugs and a license as a wholesale distributor of controlled substances, and had registered with the Food and Drug Administration as a repackager. In addition, the plaintiff had applied for, but failed to receive, a federal registration for distribution of controlled substances. The plaintiff had also contacted repackaging machine manufacturers regarding the prices of their machines, and had established procedures for complying with all relevant labeling requirements.

In December, the plaintiff also began to contact physicians about their possible interest in Practice Perfect. The plaintiff sent out approximately three hundred solicitation letters inviting interested physicians to contact them and scheduled an appointment to discuss how the physicians could benefit from Practice Perfect's proposed services. The letters stated that Practice Perfect's business would be operational in approximately three months and was dated December 13, 1986.

By January of 1987, the plaintiff had agreed on terms with Hale–Justis Drug Company for it to serve as the plaintiff's wholesale supplier. The plaintiff also began to be contacted, either through a response card that had been enclosed in the solicitations or by telephone, by physicians interested in learning more about Practice Perfect. Vincent Stitzel then began to meet with interested physicians in order to explain Practice Perfect's program to them.

By February of 1987, sixteen individuals or groups representing a total of thirty-one physicians had contacted Practice Perfect seeking more information. Following meetings with Vincent Stitzel, four of these physicians entered into written agreements to be supplied by Practice Perfect. Another three groups representing twelve physicians completed an inventory survey and returned it to the plaintiff. The plaintiff claims that the return of these inventory surveys constituted an agreement between these physician groups and Practice Perfect for the supply of drugs. However, at least one of these groups representing six physicians stated in a letter returned with the completed inventory survey that the

survey was returned in order to gain "an idea of the cost of each [drug] to help us decide whether or not to utilize your service." The other physicians who had indicated an initial interest in Practice Perfect never entered into a supply agreement with the plaintiff nor did they return an inventory survey.

Meanwhile, the defendant, Hamilton County Pharmaceutical Association (HCPA), issued the January 1987 edition of its newsletter. The newsletter reprinted the first four paragraphs of Practice Perfect's solicitation letter, which contained a general description of the drug repackaging business. It omitted the final paragraph of the letter which contained a specific description of Practice Perfect's business. The newsletter stated that the plaintiff's letter had been sent to the HCPA by an area physician who had also sent the letter to the Ohio Medical Board. It also stated that the HCPA had forwarded a copy of the letter to the Ohio State Board of Pharmacy. The newsletter described the repackaging business as both legally and ethically questionable, and stated that the HCPA would follow developments and "take appropriate actions."

After the appearance of the January newsletter, the plaintiff contacted Hale–Justis Drug Company for instructions as to how to place an order. Joseph Thomas spoke to William Van Meter of Hale–Justis who told Thomas that he had seen the HCPA newsletter. According to Thomas, Van Meter informed him that several of Hale–Justis' larger accounts had complained about the company's decision to sell drugs to the plaintiff, and that due to this pressure he would be unable to supply drugs to Practice Perfect. Thomas also stated that Van Meter told him that he doubted any wholesale distributor in Cincinnati would agree to supply Practice Perfect. Van Meter, on the other hand, stated in his deposition that Hale–Justis decided not to supply the plaintiff for its own reasons unrelated to the HCPA newsletter. Shortly after Hale–Justis refused to serve as Practice Perfect's supplier, the plaintiff entered into an agreement for the supply of drugs with Amfac of Louisville, Ken-

tucky on more favorable terms than those of the prior agreement with Hale–Justis.

On February 9, 1987, the five shareholders of Practice Perfect first discussed their involvement in that company with the Chief of Pharmacy Services at the Veterans Administration Hospital.

On February 20, 1987, the HCPA sent a letter to area physicians urging them to take "a strong stand against physician dispensing in general and the Practice Perfect, Inc. plan in particular." The letter stated that the HCPA had forwarded Practice Perfect's solicitation letter to both the Ohio State Medical Board and the State Board of Pharmacy, and that "[b]oth of these regulatory bodies share our concern and will investigate, thoroughly, Practice Perfect, Inc. and the physicians who may agree to participate in this program." The letter went on to state the basis for the investigation. Part of the stated basis was that "[o]nly a registered pharmacist or pharmacy intern under the personal supervision of a registered pharmacist may dispense a drug" under Ohio Rev.Code § 4729.28. The plaintiff alleges that the letter deliberately and misleadingly omitted the portion of the above statute that states that "nothing in this section is intended to prohibit physicians from dispensing drugs directly to their patients." However, the letter went on to discuss regulations that physicians who do dispense drugs must follow, a discussion that serves to negate any inference raised that physicians are barred from dispensing drugs under Ohio Rev.Code § 4729.28.

After the HCPA letter was distributed to area physicians, the plaintiff contends that further inquiries by physicians into Practice Perfect's business stopped, and that even those physicians who had already agreed to participate in Practice Perfect's program refused to respond to the plaintiff's phone calls. The doctors who actually entered into a written agreement with Practice Perfect, however, have stated in affidavits and depositions that they simply never again heard from the plaintiff after these events.

On February 27, 1987, Mr. Hammond, the Chief of Pharmacy Services at the Veterans Administration Hospital, informed the five shareholders of Practice Perfect that their involvement with the plaintiff created a conflict of interest with their employment at the hospital. Hammond ordered the five men to cease all activities on behalf of Practice Perfect and to divest themselves of all interest in the enterprise. By mid-March, all five shareholders signed and submitted statements that neither they nor Practice Perfect were purchasing drugs or soliciting physicians for participation in a physician dispensing program. They further stated that should Practice Perfect engage in either of these activities in the future, they would either divest themselves of their interest in Practice Perfect or discontinue their employment at the hospital.

On March 30, 1987, the plaintiff filed this law suit. At no time from the incorporation of Practice Perfect to the filing of this law suit did the plaintiff purchase drugs from any wholesaler or distribute them to any physician.

## STANDARD FOR SUMMARY JUDGMENT

The narrow question that we must decide on a motion for summary judgment is whether there is "no genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The Court cannot try issues of fact on a Rule 56 motion, but is empowered to determine only whether there are issues to be tried. *In re Atlas Concrete Pipe, Inc.,* 668 F.2d 905, 908 (6th Cir.1982). The moving party "has the burden of showing *conclusively* that there exists no genuine issue as to a material fact and the evidence together with all inferences to be drawn therefrom must be read in the light most favorable to the party opposing the motion." *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.) (emphasis original), *cert. denied,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). We are further guided by the Supreme Court's recent elaboration of this standard in *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) as follows:

> ... the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial ...

477 U.S. at 322, 106 S.Ct. at 2552.

## THE SHERMAN ACT

Section 4 of the Clayton Act creates the right to sue for treble damages in "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. § 15. In order to establish standing to sue under this section, the plaintiff must show both an injury in fact to his "business or property" and a causal connection between the injury and the defendant's alleged violation of the antitrust laws. *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1235 (6th Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981); *Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142, 1148 (6th Cir.1975). The Sixth Circuit had used a number of "causal connection" tests for determining antitrust standing before finally settling on a case-by-case analysis of the criteria set forth in *Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). *Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir.1983). The Sixth Circuit's opinion in *Southaven,* however, did not alter the requirement that a plaintiff must show injury in fact to qualify for antitrust standing.

The Supreme Court has ruled that the scope of section 4 of the Clayton Act cannot be determined by reference to its broad language alone, but that section 4 must be read in the context of the common law background in which its predecessor, section 7 of the Sherman Act, was enacted. *Associated General Contractors,* 459 U.S. at 529–35, 103 S.Ct. at 903–07. This common law context includes limits on the availability of damages when the plaintiff's injuries are of a speculative nature. *Id.* at 532–33 n. 26, 103 S.Ct. at 905–06 n. 26. Therefore, the plaintiff must be able to show a concrete injury in fact to his "business or property" in order to have standing to sue under the antitrust laws.

The plaintiff need not be engaged in an ongoing business to fulfill this requirement; a nascent business enterprise can also qualify for standing under this statute. The serious potential competitor is protected by the antitrust laws just as is the established business. In determining whether the plaintiff has shown an injury in fact to its "business or property," it is the Court's task to "distinguish the serious potential competitor who has been illegally kept out of the market from the inchoate business enterprise with a mere hope of entry." *Huron Valley Hospital, Inc. v. City of Pontiac,* 666 F.2d 1029, 1033 (6th Cir.1981).

The test for distinguishing the serious potential competitor from one with a mere hope of entry into the market focuses on the intention and preparedness to compete. A plaintiff's preparedness to compete is judged by a number of factors including "the plaintiff's background and experience in the prospective business, financial ability to enter the prospective business, substantial affirmative action toward entry, and the consummation of contracts in preparation for entry." *Id.*

Although the plaintiff in this case may be able to establish an intent to compete, it is unable to show the requisite preparedness to qualify for antitrust standing. An examination of the factors which indicate preparedness shows that Practice Perfect is seeking to recover highly speculative damages for the destruction of an enterprise that had only the merest expectation of entry into the market.

The plaintiff's principals had no special background or experience in the drug repackaging business. The five shareholders were all pharmacists employed by the Veterans Administration Hospital who seized upon the idea of forming Practice Perfect

after reading about the drug repackaging business in an October issue of the Wall Street Journal (doc. 31, p. 4). They possessed no special business acumen that would allow them to evaluate the potential of such a business.

The principals of Practice Perfect also lacked the financial ability to enter into the prospective business. Although the plaintiff was able to negotiate a credit arrangement for the purchase of the necessary prescription drugs, the plaintiff's principals were not financially prepared to discontinue their employment at the Veterans Administration Hospital in order to conduct the business of Practice Perfect. The shareholders of Practice Perfect apparently planned to continue their employment at the hospital while attempting to start their new company until they were confronted by the hospital's Chief of Pharmacy Services. The financial inability of the principals to take the necessary step of leaving their employment at the hospital demonstrates that Practice Perfect was never a viable business.

Furthermore, the actions the plaintiff had taken toward entry into the market at the time the defendant allegedly violated the antitrust laws were not sufficiently substantial to qualify for antitrust standing. The defendant issued the letter that allegedly ended all inquiries into the plaintiff's proposed business on February 20, 1987. The letter was issued over nine weeks after the plaintiff had begun to solicit physicians and less than three weeks before Practice Perfect had planned to begin doing business. Although Practice Perfect was less than three weeks away from the date it planned to begin business, the plaintiff had only managed to enter into written supply agreements with four of the approximately three hundred physicians it had solicited. Both Joseph Thomas and Vincent Stitzel stated in their depositions that Practice Perfect needed at least five physicians to just reach the break even point for starting their business (doc. 35, pp. 2–3). The plaintiff's inability to attract a sufficient number of physicians to make Practice Perfect a viable enterprise was demonstrated before the HCPA letter was issued. This inability further illustrates the plaintiff's lack of preparedness to enter the market; a shortcoming that bars the plaintiff's antitrust claims for lack of standing.

From its incorporation to the filing of this law suit, Practice Perfect never purchased, repackaged, or distributed a single prescription drug. The plaintiff alleges that this failure was due to the alleged antitrust violations of the defendant. An examination of the facts taken in the light most favorable to the plaintiff, however, demonstrates that the failure of Practice Perfect's proposed business was due to the plaintiff's own lack of preparedness to enter the market. The plaintiff's principals possessed no special business acumen, they lacked the financial ability to enter the market once they were forced to choose between their employment at the hospital and their new business, and they had failed to find a sufficient market for their services which was an essential element for the success of their proposed business. In short, the plaintiff never had a substantial prospect of creating a successful business. Instead, Practice Perfect had only an expectancy of entering into the market which was never realized due to its own shortcomings.

The plaintiffs principals themselves seemed to recognize Practice Perfect's shortcomings when they chose to sign an agreement ending Practice Perfect's attempts to start a business in order to retain their jobs at the VA hospital. The principals would have had to choose between Practice Perfect and the VA hospital regardless of the defendant's actions, and it is clear that Practice Perfect's limited potential even before the HCPA letter was issued was not capable of inspiring the necessary confidence in the principals to leave their jobs at the VA hospital.

Since this Court finds that the plaintiff lacked the required preparedness to compete necessary to demonstrate that it has sustained an injury in fact to its nascent business enterprise, the plaintiff's antitrust claims are dismissed for lack of standing.

### THE LANHAM ACT

■ Section 43(a) of the Lanham Act provides that "[a]ny person who shall ... use in connection with any goods or services ... any false description or representation ... and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." 15 U.S.C. § 1125(a). While the language of section 43(a) provides a cause of action to plaintiffs capable of showing a likelihood of harm due to the defendant's actions, the courts have limited recovery in those cases to injunctive relief. In order to recover damages under section 43(a), however, the plaintiff must show more than a mere likelihood that harm will occur. Section 43(a) was not intended to provide a windfall for plaintiffs, and therefore the plaintiff must show that it sustained actual harm to its business as a result of the defendant's misrepresentations. *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 525 (10th Cir.1987); *Schutt Manufacturing Co. v. Riddell, Inc.*, 673 F.2d 202, 206–07 (7th Cir.1982); *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 161 (1st Cir. 1977); *Reader's Digest Association, Inc. v. Conservative Digest, Inc.*, 642 F.Supp. 144, 146–47 (D.D.C.1986), *aff'd*, 821 F.2d 800 (D.C.Cir.1987).

■ As previously illustrated in the discussion of the plaintiff's claim under the Sherman Act, the plaintiff cannot show that it was injured as a result of the defendant's actions. The evidence viewed in the light most favorable to the plaintiff reveals that Practice Perfect never got off the ground because of its own shortcomings, including the fact that the plaintiff's principals were forced to choose between their employment at the VA hospital and the extremely questionable business prospects of Practice Perfect. Therefore, the plaintiff's cause of action under the Lanham Act must be dismissed because the plaintiff cannot establish that it was injured by the defendant's actions, which is an essential element of a claim for damages under section 43(a).

### CONCLUSION

This Court finds that after extensive discovery the plaintiff is unable to show that it suffered a cognizable injury which was the result of the defendants' actions. Since such a showing is necessary in order for the plaintiff to recover damages under either sections 1 and 2 of the Sherman Act or section 43(a) of the Lanham Act, the Court hereby dismisses the plaintiff's claims under those statutes. Having dismissed the plaintiff's only federal causes of action, the Court declines to retain pendent jurisdiction over the plaintiff's state law causes of action and hereby dismisses the plaintiff's state law claims without prejudice. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

SO ORDERED.