**Russell BROWN, et al., Plaintiffs,**

**v.**

**Wally ARMSTRONG, et al., Defendants.**

**Civil Action No. 93–12385–RCL.**

United States District Court,
D. Massachusetts.

Jan. 24, 1997.

---

Theodore H. Goguen, Goodman, Goguen & McLaughlin, South Natick, MA, for Russell Brown.

Scott P. Lewis, Jordana B. Glasgow, Palmer & Dodge, Boston, MA, Daniel M. Cislo, Cislo & Thomas, Santa Monica, CA, Lee C. Bromberg, Bromberg & Sunstein, Boston, MA, for Wally Armstrong, Wally Armstrong Golf, Inc., American-Telecast Corp., Kenneth Rogers, George Summerall and Gator Golf Enterprises, Inc.

LINDSAY, District Judge.

Report and Recommendation *Accepted*.

### *REPORT AND RECOMMENDATION REGARDING MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS AMERICAN TELECAST CORP., WALLY ARMSTRONG GOLF, INC., KENNY ROGERS AND PAT SUMMERALL (DOCKET NO. 43) AND MOTION OF DEFENDANTS WALLY ARMSTRONG AND GATOR GOLF ENTERPRISES, INC. FOR SUMMARY JUDGMENT (DOCKET NO. 40)*

Dec. 30, 1996.

KAROL, United States Magistrate Judge.

In November 1993, Russell Brown ("Brown") and Russell Brown d/b/a Design Specialty Company (together, "Plaintiffs") brought suit against American Telecast Corporation ("ATC"), Gator Golf, Inc., Wally Armstrong Golf, Inc. ("Wally Golf"),[1] Wally Armstrong ("Armstrong"), Kenny Rogers ("Rogers"), and Pat Summerall ("Summerall") (collectively, "Defendants"), seeking a preliminary injunction and damages in the amount of $300,000,000. Plaintiffs' suit alleges that instructional golf videotapes, starring Armstrong, and an infomercial created by ATC to sell the videotapes (along with some golf gadgets), starring Armstrong, Rogers, and Summerall, were false and misleading in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count I). Plaintiffs also claim that, by producing and distributing the infomercial and the instructional video tapes, Defendants: intentionally interfered with lawful business relations (Count II); intentionally interfered with prospective business relations (Count III); engaged in a civil conspiracy (Count IV): and, engaged in unfair and deceptive business practices in violation of Mass. Gen. L. ch. 93A, § 11 (Count V). The court (Lindsay, J.) granted Defendants' motion to dismiss the 93A claim on the ground that the activities alleged in the complaint did not occur primarily and substantially in massachusetts. (Docket no. 19.)

Defendants moved for summary judgment on the four remaining claims.[2] Plaintiffs opposed the motion (Pls.' Mot. Opp. Summ. J., Docket no. 49) and submitted a brief in opposition (Pls.' Brief Opp. Summ. J., Docket no. 50); a statement of facts in support of their opposition (Pls.' Statement of Facts Opp. Mot. Summ. J., Docket no. 51) ("Plaintiffs' Fact Statement"); and an accompanying appendix. Defendants promptly moved to strike Plaintiffs' Fact Statement and appendix (Defs.' Mot. Strike Pls.' Fact Statement, Docket no. 56). Plaintiffs did not respond.[3]

---

**1.** Defendant Wally Golf is a separate corporate entity established by ATC. Since nothing in this litigation turns on a distinction between the two, this opinion will refer to both as ATC.

**2.** Defendants submitted a joint statement of undisputed facts in support of their motions for summary judgment ("Defendants' Fact Statement" or "FS") (Docket no. 46). ATC, Wally Golf, Rogers, and Summerall submitted a motion for summary judgment ("ATC's summary judgment motion") (Docket no. 43), and Armstrong and Gator Golf submitted a separate motion for summary judgment ("Armstrong's summary judgment motion") (Docket no. 40). Although Defendants submitted two separate motions, many of the arguments in their supporting memoranda overlap. I will, therefore, distinguish between individual defendants only when a material distinction exists.

**3.** At oral argument, Plaintiffs conceded that they did not file an opposition to Defendants' motion to strike Plaintiffs' Fact Statement. I noted during the argument, however, that "Plaintiffs [sic] Opposition to Defendants [sic] Motion for Leave to File Reply Brief on Summary Judgment" (Docket no. 60) ("Plaintiffs' Opposition to Reply Brief") contained several paragraphs that apparently were responsive to Defendants' motion to strike. I will deem these sections of Plaintiffs' Opposition to Reply Brief to be Plaintiffs' opposition to Defendants' Motion to Strike Plaintiffs' Fact Statement.

Plaintiffs did, however, file a motion to strike Defendants' Fact Statement (Pls.' Mot. Strike Defs.' Fact Statement, Docket no. 59), to which Defendants filed a timely opposition (Defs.' Opp. Pls.' Mot. Strike Defs.' Fact Statement, Docket no. 62).

## I.

### Summary Judgment Record

■ Before reaching the merits of Defendants' summary judgment motions, I must first determine what facts, if any, are in dispute. Before I can do that, I must decide the parties' respective motions to strike each others' fact statements.

### A. Plaintiffs' Motion to Strike Defendants' Fact Statement (Docket no. 59)

Plaintiffs move to strike Defendants' Fact Statement on two grounds: (1) that Defendants' Fact Statement omitted 34 pages of evidentiary material, which caused "extreme prejudice;" and (2) that exhibit 10 to Defendants' Fact Statement was a deliberate attempt to submit false and misleading evidence to this court. (Pls.' Mot. Strike Defs.' Fact Statement at 1–2.) Plaintiffs' motion is completely without merit. The omission of 34 pages appears to have been the result of a clerical error, which Defendants' counsel brought to Plaintiffs' attention and promptly corrected. Moreover, there could have been no prejudice to Plaintiffs, because the missing pages were from Brown's own deposition testimony, to which Plaintiffs clearly had access. Plaintiffs' second assertion is that Defendants' counsel intentionally requested that the publisher of a golf catalog send him only the cover page to a golf catalog, so that Defendants could submit the cover page with the body of another catalog. This bold assertion that Defendants' counsel committed fraud on the court is not supported by any evidence, and it is rebutted by an affidavit submitted by Debbie O'Reilly. Ms. O'Reilly states that the company for which she works, The Golfworks, mistakenly sent the wrong cover page to Defendants' counsel. (O'Reilly Aff. ¶ 3, Docket no. 68.) For the foregoing reasons, Plaintiffs' motion to strike Defendants' Fact Statement is **DENIED**.

### B. Defendants' Motion to Strike Plaintiffs' Fact Statement (Docket no. 56)

■ In response to Defendants' motions for summary judgment, Plaintiffs filed a 107 paragraph statement of facts with an accompanying appendix, purportedly in compliance with Local Rule 56.1. Local Rule 56.1 was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of determining whether the disputed issues are material. The rule accomplishes its objective by requiring that a summary judgment motion "include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried," with citation to the record, and that the opposition "include a concise statement of the material facts of record as to which it is contended there exists a genuine issue to be tried," also with citations to the record. D. Mass. Local R. 56.1. If the moving party complies with the Local Rule, any material facts of record set forth within their statement "will be deemed for purposes of the motion to be admitted ... unless controverted by the statement required to be served by opposing parties." *Id.* The non-movant's response must "state what *specific facts* are disputed and prevent summary judgment." *Vasapolli v. Rostoff,* 864 F.Supp. 215, 218 (D.Mass.1993), *aff'd,* 39 F.3d 27 (1st Cir.1994) (emphasis added).

■ Plaintiffs' Fact Statement fails to comply with Local R. 56.1. It does not distinguish between facts involved in the case generally, and material facts that are genuinely in dispute. It clearly is not a statement of "specific facts" in dispute. *Id.* Moreover, Plaintiffs' Fact Statement frequently makes conclusory statements and allegations that are not supported by citations to the record. Even where citations are provided, the cited portion of the record often does not support the point for which it is cited. Plaintiffs' Fact Statement thus "generates a lot of dust, ... [but] it does not further the goal of sharply focusing areas of dispute." *Key Trust Co. of Maine v. Doherty, Wallace, Pillsbury & Murphy, P.C.,* 811 F.Supp. 733, 734 n. 2 (D.Mass.1993). For these and other

reasons, Defendants requested that Plaintiffs' Fact Statement be stricken. I agree that Plaintiffs' Fact Statement does not comply with Local R. 56.1. Rather than strike it, however, I choose to impose the sanction provided for in the rule itself. Accordingly, I **DENY** Defendants' motion to strike and, instead, I will deem all facts set forth in Defendants' Fact Statement to be admitted, at least where Defendants provide a citation to the record which supports the assertion of fact in question.[4]

## II.

### Undisputed Facts

Plaintiffs' claims in this case concern a television infomercial that promoted an instructional golf kit that included a three-part instructional video and a number of golf training devices. In late 1990 or early 1991, individuals at ATC, a corporation which produces and broadcasts direct response advertisements, including infomercials, decided there was a market for a high-end set of instructional golf videotapes which could be marketed through the use of an infomercial. Representatives from ATC met with Armstrong, an internationally recognized golf instructor, in May 1991, and decided to use him in the videotapes and infomercial. In September 1991, Armstrong, through his company, Gator Golf, executed a contract with ATC to produce an infomercial and a set of instructional videotapes. In preparation for the infomercial and videotapes, Armstrong and representatives from ATC extensively discussed Armstrong's teaching techniques and the training aids he used to demonstrate these techniques. During this time, Armstrong presented a number of different items for possible inclusion in the video and infomercial, including the Birdie Puck and the Power Max discussed below. The kit, as finally developed and advertised on the infomercial, was titled "Maximizing Your Game and Everything About It" ("Maximizing Your Game").

The infomercial featured Wally Armstrong, as a professional golf player who gives in-

structions on how to play better golf, along with Kenny Rogers and Pat Summerall, as celebrities who testify that their golf games improved after they implemented some of Armstrong's instructions. The final version of the "Maximizing Your Game" kit included a three-tape, six-hour set of golf instructional videotapes and five golf instructional devices, including: a ruler (to help the golfer learn how to grip a golf club); an alignment device (to help the golfer properly line up the face of the putter); a coat-hanger device (to assist the golfer in developing the proper wrist position during a golf swing); a ball on a string (to assist in creating a smooth golf swing); and a sponge (for use in practicing the chip shot). (FS ¶ 31.) The Birdie Puck and the Power Max were not included. The retail price of the kit was $149.95. The infomercial promoting the kit ran from December 1991 to January 1994. (FS ¶ 32.)

Brown is an inventor and an amateur golf enthusiast. He has invented and marketed a number of different golf instructional devices and gadgets, two of which are relevant to this lawsuit. The first, the Birdie Puck, is a golf ball substitute made of velcro which sticks to a corresponding piece of velcro on the head of a golf club; it is designed to show the golfer where the golf club head makes contact with the ball. The second, the Power Max, is a two-piece platform on which a golfer stands that makes an audible click when the golfer improperly shifts his or her weight. The Birdie Puck and the Power Max were sold separately at a retail price of $11.95 and $19.95, respectively. (FS ¶ 45.) Brown, however, was unable to sell more than a few hundred units of each. (FS ¶ 42.)

Brown met Armstrong in 1990. Later that year, Brown and Armstrong entered into an agreement pursuant to which Armstrong appeared in a television commercial promoting the Forty XL, an earlier version of the Power Max. In the summer of 1991, Brown and Armstrong entered into another agreement pursuant to which Armstrong appeared in both a 20–minute video promoting

---

**4.** I note, however, that I have reviewed Plaintiffs' Fact Statement thoroughly, and, even if I were to consider it, I would make the same recommen-

dation regarding the disposition of Defendants' summary judgment motions.

Brown's Power Max and in a second version of the video, which was identical to the first, except that it added a 2–minute section discussing the Birdie Puck. (FS ¶ 56.) The contract between Brown and Armstrong for the production of the videos did not contain any restrictions on Armstrong's use of any ideas used in the videos. Brown assembled the second version of the video, together with the Birdie Puck, the Power Max, and an audiotape featuring himself, into a package called the UltraMax III, which he offered for sale at a retail price ranging from $49.95 to $59.95. (FS ¶ 45.) Even with Armstrong's endorsement of the Birdie Puck and the Power Max, sales remained disappointing. (FS ¶ 61.) Armstrong offered to make additional efforts to promote the Birdie Puck and the Power Max, but Brown declined and decided to market his products on his own. (FS ¶ 64.) During this time, Armstrong was discussing the "Maximizing Your Game" kit with ATC. (FS ¶ 65.) Armstrong informed Brown of his deal with ATC and believed that his exposure in the ATC infomercial and videotapes would enhance his value as a promoter of Brown's products. (*Id.*) Armstrong's contract with ATC explicitly acknowledged the existence of the two instructional videotapes Armstrong had made with Brown. (FS ¶ 66.)

Three ideas or concepts used by Defendants in the "Maximizing Your Game" videotapes are central to Plaintiffs' claims. First is the concept of "coiling" the right thigh during a golf swing. This concept appeared in a book entitled "The Essentials of Golf," first printed in 1927, (FS ¶ 77), and Brown admits that "talking about coiling in the golf swing is as old as the hills," (FS ¶ 76). The second idea is analogizing this coiling to the twisting and untwisting of a rubber band used to drive a propeller in a model airplane. The idea of analogizing muscles to a rubber band appeared in a 1972 book called "The Touch System for Better Golf," (FS ¶ 79), and Brown admits that he disclosed the model plane analogy to more than a dozen golfers prior to making the two videos with Armstrong, (FS ¶ 80). The third idea is analogizing the golf swing to a soccer-style kick in football. The soccer-style kick analogy was employed by Armstrong in a 1989 video,

prior to his first encounter with Brown, (FS ¶ 72), and has been around since · at least 1982, (FS ¶ 73). In Armstrong's appearances in the two videotapes he made with Brown, he used the concept of coiling the right thigh and the model airplane analogy.

## III.

### Analysis

#### A. Summary Judgment Standard

The standard for summary judgment is familiar. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). At the outset, the moving party must aver that there is " 'an absence of evidence to support the nonmoving party's' " position. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). To avoid summary judgment, the opposing party must produce affirmative evidence demonstrating a genuine issue for trial. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991). "[T]he nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989). In deciding a motion for summary judgment, the court must view the evidence "in the light most favorable to the nonmovant, and all doubts and reasonable inferences must be resolved in the nonmovant's favor. . . . If the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the nonmovant." *Casas Office Machines, Inc., v. Mita Copystar America, Inc.*, 42 F.3d 668, 684 (1st Cir.1994) (internal quotation marks and citations omitted).

#### B. Lanham Act Claims

Count One of Plaintiffs' complaint asserts that Defendants violated § 43(a) of the Lan-

ham Act, 15 U.S.C.A. § 1125(a).[5] Section 43(a) of the Lanham Act contains two separate causes of action for unfair competition. The first prong creates liability for trademark, tradename or trade dress infringement, or for a false designation of origin, § 43(a)(1)(A); and the second prong creates liability for false advertising, § 43(a)(1)(B). 3 J. Thomas McCarthy, *McCarthy's on Trademark and Unfair Competition,* § 27.02[3], at 27–17 (3d ed.1996). Under a liberal reading of Plaintiffs' complaint and response to Defendants' motion for summary judgment, Plaintiffs have identified two theories of liability under each prong, each of which will be dealt with in turn.

### 1. Section 43(a)(1)(A)

In order to succeed on an infringement/false designation of origin claim under § 43(a)(1)(A), Plaintiffs must prove each of the following elements: (1) Defendants used a designation (any word, term, name, device, or any combination thereof) or false designation of origin; (2) the use was in interstate commerce; (3) the use was in connection with goods or services; (4) the designation or false designation is likely to cause·confusion, mistake. or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person; and (5) plaintiff has been or is likely to be damaged by these acts. 3 *McCarthy on Trademarks* § 27.03[1][a], at 27–22 to 27–23.

Plaintiffs' first argument under this prong of § 43(a), although difficult to decipher, appears to posit that Defendants confused and deceived the public regarding the origin of—

Defendants' products by using terms associated with Plaintiffs' products in-reference to their own. The particular terms Defendants allegedly used were "Max Pack," and "The Ultimate Improvement Package." *See* Pls' Brief Opp. Summ. J. at 12. The short and dispositive response to this claim is that there is no evidence that Defendants used either of these terms in the marketing of their infomercial or videotapes, or in the infomercial or videotapes themselves. In the absence of any evidence that Defendants used either of the terms in or with reference to their products, this claim fails.

▮ Plaintiffs' second claim under the infringement/false designation of origin prong of § 43(a) is also difficult to understand. It appears to be that Defendants used three teaching concepts that Plaintiffs had popularized and that such use caused confusion between Plaintiffs' products and Defendants'. Those concepts are the ones discussed earlier, namely the "coiling" of the right thigh; drawing an analogy between this coiling and a rubber band propeller in a model airplane; and drawing an analogy between a golf swing and a soccer-style kick in football. Plaintiffs thus seem to claim that the public so strongly associates these ideas with Plaintiffs' products that the ideas themselves have become a type of, or at least serve the same purpose as, a trademark or other, more conventional designation of origin. Plaintiffs have not cited, however, and I have not found, a case supporting the proposition that the Lanham Act creates or confers proprietary rights in ideas. To the contrary, courts that have considered such argument have rejected it. *See, e.g., Kienzle v. Capital Cities/American Broadcasting Co.,* 774 F.Supp. 432, 438 (E.D.Mich.1991) (stating that plaintiff had

---

**5.** Section 43(a) of the Lanham Act, as amended in 1988 and 1992, provides in pertinent part:
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
  (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin,

sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
  (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15   U.S.C.A. § 1125(a) (West 1996).

not cited "a single case to support [the] contention that the Lanham Act encompasses a claim that involves only the copying of an idea for a television series"); *Vantage Point, Inc. v. Parker Brothers, Inc.*, 529 F.Supp. 1204, 1219 (E.D.N.Y.1981), *aff'd*, 697 F.2d 301 (2d Cir.1982) (stating that § 43(a) of the Lanham Act did not apply to a claim involving misappropriation by a game company of a game idea which had been submitted to it).

■ There is a second problem with Plaintiffs' argument that Defendants' use of ideas that the public associated with Brown caused customers to confuse Plaintiffs' products with Defendants'. There is insufficient evidence to support a rational inference that such confusion existed.

Specifically, there are only two references in Plaintiffs' filings to confusion regarding ideas of any kind. First, Brown's friend and business associate, John Barnicle, claims in his Affidavit that prospective customers expressed confusion because the ideas Armstrong expressed in Defendants' videos regarding the proper use and importance of the wrists and legs during the golf swing contradicted the ideas Armstrong had previously expressed on that subject in Plaintiffs' videos. (Barnicle Aff. ¶ 7, Pls.' Fact Statement, Ex. 80). The ideas referred to by Barnicle are clearly not the three ideas that are the subject of Plaintiffs' Lanham Act claim, however, and, in any event, the confusion to which Barnicle refers has nothing to do with the origin of Defendants' products, as distinguished from confusion about which of two contradictory positions viewers were expected to believe.[6] The second reference to confusion regarding ideas is found in Brown's Affidavit, where Brown claims that prospective customers at a golf show, after viewing Brown's videos starring Armstrong, accused Brown of "stealing Armstrong's ideas."

(Brown Aff. ¶ 16, Pls.' Fact Statement, Ex. 82.) Confusion about the origin of an idea, however, is different from confusion about the origin of the goods or services which the idea is used to promote. There is no evidence in Brown's Affidavit that the prospective customers who accused Brown of stealing Armstrong's ideas believed, mistakenly, that Brown was selling, had produced, or had otherwise endorsed or associated himself with Defendants' videotapes.

Because the Lanham Act neither proscribes the misappropriation of ideas nor affords protection to the purported use of an idea as a trademark or other designation of origin, and because, in any event, there is no evidence that members of the public were confused about the origin of Defendants' videotapes due to the fact that Armstrong, without attribution, used ideas Plaintiffs claim the public associated with Brown, Plaintiffs' second claim under the infringement/false designation of origin prong of § 43(a) of the Lanham Act also fails.

### 2. Section 43(a)(1)(B)

■ Plaintiffs also claim that Defendants engaged in false advertising. To prevail on a claim for false advertising under § 43(a)(1)(B) of the Lanham Act, Plaintiffs must establish at least the following three elements:

(1) Defendants made false or deceptive advertisements or representations to customers;

(2) those advertisements deceived a significant portion of the consuming public; and

(3) Plaintiffs were injured by Defendants' conduct.

*Pacamor Bearings, Inc. v. Minebea Co. Ltd.*, 918 F.Supp. 491, 498 (D.N.H.1996): *see also William H. Morris Co. v. Group W, Inc.*, 66

---

**6.** In another paragraph of his Affidavit, Barnicle does refers to customer confusion regarding the origin of products. Thus, in Paragraph 4, he states that, after Defendants' "infomercial began airing in the Northeast, the public ... were [sic] confused as to whether they had purchased our product someone else was selling." Although this statement is very difficult to understand, it is clear that Barnicle does not attribute such confusion to the use by Armstrong of the three ideas that are the subject of Plaintiffs' complaint, as

distinguished, for example, from the fact that both parties were using Armstrong to sell videos that involved golf and golf gadgets. In fact, since the three ideas that Defendants allegedly misapproved do not appear in the infomercial at all, as distinguished from the videos themselves, it is not at all apparent why any member of the public, upon viewing the infomercial, would make a mental association between those ideas and Brown.

F.3d 255, 257 (9th Cir.1995) (per curiam) (adopting this three-part test). Plaintiffs suggest two theories pursuant to this "false advertising" prong of § 43(a). First, they allege that Defendants engaged in false advertising by using Brown's ideas in the "Maximizing Your Game" videos without crediting Brown as the source of those ideas; second, Plaintiffs allege that Summerall and Rogers falsely stated in the infomercial that their golf games had improved as a result of their using some of the techniques discussed in the "Maximizing Your Game" videos. Neither theory has merit.

### a. The Use of Brown's Ideas

Plaintiffs first claim that Defendants engaged in false advertising when they failed to give Brown credit for the idea of "coiling" the thigh and the model airplane and soccer-style football kick analogies which appear in Defendants' "Maximizing Your Game" videotapes.[7] This claim, in other words, asserts that the same facts which failed to establish liability for "false designation of origin" establish liability for false advertising. Plaintiffs' argument fails because the alleged false statements were not contained in an advertisement or promotion. It also fails because use of these ideas did not mislead, and is not likely to mislead, consumers.

### (1) Deceptive Advertisement or Promotion

■ It is axiomatic that, to establish false advertising, Plaintiffs must identify an advertisement or promotion containing false information. Section 43(a)(1)(B) of the Lanham Act, by its express terms, is limited to misrepresentations contained in "commercial advertising or promotion." 15 U.S.C.A. § 1125(a)(1)(B). To fall within the scope § 43(a)(1)(B), an advertisement or promotion must be:

(1) commercial speech;

(2) by a defendant who is in commercial competition with plaintiff;

(3) for purposes of influencing consumers to buy defendant's goods; ...

[and,]

(4) disseminated sufficiently to the relevant purchasing public.

*Gordon and Breach Science Publishers v. American Institute of Physics,* 859 F.Supp. 1521, 1536 (S.D.N.Y.1994); *see also Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1384 (5th Cir.1996) (adopting this four-part test for determining scope of § 43(a)(1)(B)).

Applying this test, it is immediately apparent that the first problem with Plaintiffs' argument is that the alleged false statements of which Plaintiffs complain appear only in the "Maximizing Your Game" videotapes themselves, not in the infomercial. Since the videotapes were obviously not used for the purpose of influencing consumers to buy the "Maximizing Your Game" kit which contained the videotapes, the alleged false statement cannot be actionable under § 43(a)(1)(B). *See e.g., Marcyan v. Nissen Corp.,* 578 F.Supp. 485, 507 (N.D.Ind.1982) (declaring that user's manual which consumer typically does not see until he or she has already purchased the product does not constitute product advertising or promotion), *aff'd sub nom. Marcyan v. Marcy Gymnasium Equipment Co.,* 725 F.2d 687 (7th Cir.1983). Because the alleged false statements do not appear in the infomercial—the only item designed to persuade consumers to purchase the "Maximizing Your Game" kit, Plaintiffs' argument under § 43(a)(1)(B) of the Lanham Act must fail.

### (2) Customer Deception

■ A second obstacle to Plaintiffs' theory that Defendants' use of Brown's ideas creates liability for false advertising under § 43(a)(1)(B) of the Lanham Act is that there is no evidence of consumer deception.[8] To

---

7. It is important to note that Plaintiffs are not claiming that Defendants used any of Brown's ideas in the infomercial through which they promoted the "Maximizing Your Game" videotapes.

8. A plaintiff seeking damages must show that customers were *actually* misled by the false advertising, *Aktiebolaget Electrolux v. Armatron International, Inc.,* 999 F.2d 1, 5, (1st Cir.1993),

while a plaintiff seeking an injunction need only show customers are *likely* to be misled, *Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.,* 799 F.2d 6, 12 (1st Cir.1986). Here, Plaintiffs are seeking both injunctive relief and damages. Plaintiffs' claim for injunctive relief, however, is moot to the extent it is based on the infomercial, because the infomercial stopped running in 1994, and there are no

show consumer deception, Plaintiffs must show two things. First, they must show that Defendants' representations were either literally false or misleading, *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir.1993); *Johnson & Johnson \* Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992), and, second, they "must also show that [Defendants'] misrepresentation is material, in that it is likely to influence the purchasing decision." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir.1990) (internal quotation marks omitted). Plaintiffs do not present evidence sufficient to satisfy either requirement.

Regarding falsity, Plaintiffs do not argue that anything in Defendants' videotapes is literally false. Instead, they argue that Armstrong's failure to disclose the originator of the concept of coiling the thigh and the model airplane and soccer-style kick analogies is misleading because it implies that Armstrong was himself the originator of those ideas. Plaintiffs' argument that a failure to disclose may be actionable under § 43(a)(1)(B) is highly suspect.[9] Assuming, *arguendo*, its validity, however, Plaintiffs' claim still fails because Plaintiffs have presented no evidence that Defendants' alleged failure to discuss the origin of the ideas expressed in the video-

tapes caused the public to assume that the ideas originated with Armstrong.[10]

Moreover, even if it is assumed that Armstrong, by his silence, deceived consumers into thinking he originated those ideas, Plaintiffs have presented no evidence that customers cared at all who the originator was, let alone that anyone based or would base their purchasing decision on such belief. Because there is no evidence that Defendants' silence regarding the origin of the ideas in question influenced or is likely to influence any consumer's purchasing decision, there is no basis upon which a factfinder could rationally conclude that the omission was material. Thus, there is no liability pursuant to § 43(a)(1)(B). *See e.g., Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir.1989) (holding that in "a suit for damages under Section 43(a), ... actual evidence of some injury *resulting from the deception* is an essential element of the plaintiff's case") (emphasis in original); *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir.1982) (stating that a plaintiff seeking damages for violation of § 43(a) "must demonstrate that it has been damaged by actual consumer reliance on the misleading statements"); *Servicetrends, Inc. v. Siemens Medical Systems, Inc.*, 870 F.Supp. 1042, 1067–68 (N.D.Ga. 1994) (granting summary judgment for defendants, due to plaintiff's inability to show

---

plans to air it in the future. (FS ¶¶ 32–33.) To the extent that the claim for injunctive relief is based on the videotapes, such claim must fail not just because the videotapes themselves do not constitute advertising or promotion, but because, for reasons discussed below, Plaintiffs have not presented any evidence that they are likely to be injured as a result of customer confusion regarding the source of the ideas in the "Maximizing Your Game" videotapes. *See* 3 *McCarthy's on Trademark*, § 27.04[3][a] at 27–43 (stating that § 43(a) has been interpreted to require the plaintiff seeking injunctive relief to "introduce some proof providing a reasonable basis for the belief that it is likely to be damaged *as a result of* the allegedly false advertisement").

9. There is support in the caselaw for the proposition that § 43(a)(1)(B) only reaches affirmative misrepresentations. *See e.g., Vantage Point, Inc. v. Parker Bros., Inc.*, 529 F.Supp. 1204, 1219 (E.D.N.Y.1981), *aff'd* 697 F.2d 301 (2d Cir.1982) (declaring that § 43(a) "is concerned with affirmative misrepresentations about the nature of goods a defendant has sold or offered or advertised for sale"); *Kienzle v. Capital Cities/Ameri-*

can *Broadcasting Co.*, 774 F.Supp. 432, 438 (E.D.Mich.1991) (same); *see also Alfred Dunhill, Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237–38 (2d Cir.1974) (finding that defendant's failure to disclose that tobacco was water damaged did not state a claim under the Lanham Act); *Universal City Studios, Inc. v. Sony Corp.*, 429 F.Supp. 407, 410 (C.D.Ca.1977) (declaring that failure to disclose is not actionable under the Lanham Act); *but see Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F.Supp. 360, 366 (S.D.Fla.1996) (declaring that "where an advertisement becomes untrue or is affirmatively misleading as a result of a ... failure to disclose a material fact, an actionable Lanham Act violation may arise"); *Bohsei Enterprises Co. v. Porteous Fastener Co.*, 441 F.Supp. 162, 164 (C.D.Ca.1977) (declaring that § 43(a) covers failure to disclose the material fact of the imported nature of the goods).

10. In fact, as noted, neither Armstrong nor Brown was the originator of any of the ideas in question.

that alleged misrepresentations "actually influenced any customer's buying decisions"), *amended by* 1994 WL 776878 (S.D. Ga. June 24, 1994); *Practice Perfect, Inc. v. Hamilton County Pharmaceutical Ass'n,* 732 F.Supp. 798, 804 (S.D.Ohio 1989) (stating that "plaintiff must show that it sustained actual harm to its business as a result of the defendant's misrepresentations"); *Break–Away Tours, Inc. v. British Caledonian Airways,* 704 F.Supp. 178, 182 (S.D.Cal.1988) (declaring that "[d]amages may be obtained under Section 43(a) only to the extent that such damages were caused by the violation of the [Lanham] Act").

### b. Statements made by Rogers and Summerall

■ Plaintiffs' second argument for liability under the false advertising prong of § 43(a) is that Rogers and Summerall falsely claimed in the infomercial that their golf games had improved as a result of the advice given by Armstrong in the "Maximizing Your Game" videotapes. (Compl.¶ 25.) It is clear that the infomercial is advertising, and Defendants do not contest that the infomercial was created before the "Maximizing Your Game" videotapes. Because Defendants' summary judgment motions do not address the veracity of Rogers' and Summerall's statements in the infomercial and because it is doubtful that Rogers and Summerall could have benefited from ideas expressed in videotapes that had not yet been created, I will assume that the claims made by Rogers and Summerall in the infomercial were false. Nevertheless, Plaintiffs' claim again must fail because, taking the evidence in the light most favorable to Plaintiffs, there is no evidence that any consumer was actually misled or made a purchasing decision as a result of having been misled.[11] In fact, it was for these very reasons that the claim Plaintiffs make here was rejected in previous litigation by a different plaintiff against those same defendants. In *BMMG, Inc. v. American Telecast Corp.,* CV–92–3308 HLH, slip op. at 3–4 (C.D.Cal. May 3, 1993), the district court

found that Rogers' and Summerall's statements in the infomercial were false but that Plaintiffs had made no showing that they were injured by the falsity. On appeal, the Ninth Circuit held that, although there was evidence "that American Telecast's sales caused BMMG to lose sales, it [the evidence] does not link the loss of sales to the alleged deception. There is no evidence sufficient to create a genuine issue of material fact as to whether the alleged *deception* caused any injury to BMMG. . . . The causal link is missing." *BMMG, Inc. v. American Telecast Corp.,* 42 F.3d 1398 (9th Cir.1994) (unpublished opinion), *cert. denied.* —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995). The same is true here. There is no evidence to link the loss of Plaintiffs' sales to any falsity in Defendants' infomercial. In fact, there is no evidence in the record that any customer even mentioned Rogers and Summerall, let alone evidence that Rogers' or Summerall's statements caused Plaintiffs any injury. Therefore, Plaintiffs' fourth and final claim under the Lanham Act, like the first three, must be rejected.

### C. Intentional Interference With Advantageous Relationship or Prospective Relationship

■ Count Two of Plaintiffs' complaint alleges that Defendants interfered with an advantageous business relationship between Brown and Armstrong, and Count Three alleges that Defendants interfered with a prospective business relationship. . These are both common law claims which require the same elements of proof, except, in the former, Plaintiffs must prove an existing business relationship, while, in the latter, Plaintiffs must prove a contemplated relationship. The elements are as follows:

(1) a business relationship or contemplated contract of economic benefit;

(2) the defendant's knowledge of such relationship;

---

**11.** As discussed above, Plaintiffs' claim for injunctive relief based on the infomercial is moot because the infomercial is no longer being aired. To recover damages, Plaintiffs must show that customers were *actually* deceived by the false advertising. *Aktiebolaget Electrolux,* 999 F.2d at 5.

(3) the defendant's interference with the relationship through improper motive or means; and,

(4) the plaintiff's loss of advantage as a direct result of the defendant's conduct.

*American Private Line Services, Inc. v. Eastern Microwave, Inc.*, 980 F.2d 33, 36 (1st Cir.1992); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 551 N.E.2d 20, 21 (1990).

■■■■ The existing business relationship with which Plaintiffs claim Defendants interfered is Brown's contract with Armstrong. This claim fails because there is no showing that ATC, Rogers, or Summerall had any knowledge of Brown's contract with Armstrong.[12] (FS ¶¶ 87, 992.) *See Yiakas v. Savoy*, 26 Mass.App.Ct. 310, 315, 526 N.E.2d 1305, 1309 (1988) (declaring that, to be liable for tortious interference with a contract, an actor "must have knowledge of the contract and must know that he is interfering with its performance"). In addition, because these defendants had no knowledge of Brown's contract with Armstrong, they clearly could not have acted intentionally "through improper motive or means" to interfere with this relationship. *American Private Line Services*, 980 F.2d at 36. Armstrong stands in a different posture than the other defendants, because he obviously was aware of his contract with Brown, but he cannot be liable for tortious interference with his own contract. *Riseman v. Orion Research, Inc.*, 394 Mass. 311, 314, 475 N.E.2d 398, 400 (1985); *see also Powderly v. Metrabyte* Corp., 866 F.Supp. 39, 43 (D.Mass.1994) (stating that "a party cannot be liable for tortious interference with its own contract") (internal quotation marks omitted); W. Page Keeton, *Prosser and Keeton on the Law of Torts*, § 129, at 990 (5th ed.1984) (stating that "defendant's breach of his own contract with the plaintiff is of course not a basis for the tort [of intentional interference with contractual relations]".)

■■■■ The contemplated business relationship in Count Three appears to be Brown's potential relationship with all customers and prospective customers. (Compl.¶ 40.) To establish a contemplated business relationship, Plaintiffs must show that Brown had a "probable future business relationship anticipating a reasonable expectancy of financial benefit." *American Private Line*, 980 F.2d at 36. Brown, however, admitted in his deposition that none of his golfing gadgets were successful, even before Defendants' infomercial aired. (FS ¶¶ 38, 42, 53, 61.) There is no reason to think that Plaintiffs' products would have been successful without any interference by Defendants. Even more to the point, there is no evidence that Defendants intentionally and improperly interfered with Brown's product sales.

## D. Civil Conspiracy

■■■■ Count Four of Plaintiffs' complaint alleges that Defendants conspired to interfere with Brown's business. Civil conspiracy is recognized as a "very limited cause of action in Massachusetts." *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir.1994) (quoting *Jurgens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass.1985)). It requires "a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Maryland Cas. Co. v. Hosmer*, 93 F.2d 365, 366 (1st Cir.1937), and the plaintiff must show that the "defendants, acting in unison, had some particular power of coercion over plaintiff that they would not have had if acting independently," *Tennaro v. Ryder System, Inc.*, 832 F.Supp. 494, 499 (D.Mass.1993) (internal quotation marks omitted). An unlawful or tortious act is a necessary requirement to a civil conspiracy claim. *City of Boston v. Simmons*, 150 Mass. 461, 463, 23 N.E. 210, 211 (1890); *Prosser and Keeton on the Law of Torts*, § 46, at 324. Plaintiffs' civil conspiracy claim fails because, as discussed above, Plaintiffs have not stated a valid·tort claim involving any of the defendants. Without a tort, there can be no civil conspiracy. Moreover, there

---

**12.** Defendants concede that some individuals at ATC were aware of the Birdie Puck and the Power Max, because ATC considered including them as gadgets in the "Maximizing Your Game" kit. Knowledge of Brown's products, however, does not show Defendants had knowledge of Armstrong's contract with Brown.

is no evidence that Defendants, separately or in combination, possessed any "power of coercion" over Brown. *Tennaro,* 832 F.Supp. at 499.

### E. Unpleaded Claims

██ In their rambling response to Defendants' motions for summary judgment, Plaintiffs suggest two additional claims that they did not plead in their complaint. First, they seem to argue that, when Armstrong used Brown's teaching concepts in the "Maximizing Your Game" videotapes, he misappropriated Brown's trade secrets. (Pls.' Brief Opp. Mot. Summ. J. at 2.) To establish such claim, Plaintiffs must show, among other things, that Brown and Armstrong shared a confidential relationship and that Brown possessed a trade secret. *See Burten v. Milton Bradley Co.,* 763 F.2d 461, 463 (1st Cir.1985) (stating "a plaintiff alleging misappropriation of trade secrets must show that he shared a confidential relationship with the defendant, possessed a trade secret, disclosed it to the defendant, and that defendant made use of the disclosure in breach of the confidence"); *see generally* 3 Melville B. Nimmer, et al., *Nimmer on Copyright,* § 16.01, at 16–4 (1996) (discussing requirements for misappropriation of trade secrets). There is no evidence of such relationship, however, and it is clear that the three concepts that Brown says Armstrong misappropriated were not trade secrets. The record is clear that all were in the public domain for years before Brown disclosed them to Armstrong, (FS ¶¶ 72–80), and, independently, Brown's use of them in his own videotapes eliminates any trade secret protection to which they may have been entitled. *CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 850 (1st Cir.1985).

██ The second unpleaded claim Plaintiffs may be attempting to assert is for copyright infringement. (Pls.' Brief Opp. Mot. Summ. J. at 13–14.) Here, again, Plaintiffs' argument is without merit. First, copyright law does not provide legal protection for ideas, as distinguished from a tangible expression of those ideas. 17 U.S.C. § 102(b); *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,* 888 F.Supp. 192, 197 (D.Me.1995), *aff'd,* 97 F.3d 1504 (1st Cir.

1996). Second, Plaintiffs have not identified the registration of any copyright. "Lack of copyright registration is fatal to [a] copyright infringement cause of action and requires its dismissal." *Miller v. CP Chemicals, Inc.,* 808 F.Supp. 1238, 1242 (D.S.C.1992); *see also* 17 U.S.C. 411(a) ("[N]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this Title."). Finally, as noted above, the ideas that Plaintiffs claim are original to Brown, in fact, are not novel; they have been in the public domain for years. Therefore, they cannot be protected by copyright for this reason as well. *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991). For all the foregoing reasons, Plaintiffs' claim for copyright infringement, assuming they are making such claim, must fail.

### IV.

### CONCLUSION

For the foregoing reasons, I recommend that ATC's summary judgment motion (Docket no. 43) and Armstrong's summary judgment motion (Docket no. 40) be **GRANTED.**

### V.

### *IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS*

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Ap-

peals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13 (1st Cir.1983); *see also Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).