Diane KIBBE and Shirley
Gregory, Plaintiffs,

v.

John E. POTTER, Postmaster General,
United States Postal Service, and
Daniel Griffin, Defendants.

Sandra Harrington, Plaintiff,

v.

John E. Potter, Postmaster General,
United States Postal Service, and
Daniel Griffin, Defendants.

Nos. Civ.A. 98–30241–MAP,
Civ.A. 99–30194–MAP.

United States District Court,
D. Massachusetts.

March 21, 2002.

Karen L. Goodwin, United States Attorney's Office, John D. Connor, Moriarty & Connor, Springfield, MA, for Defendants.

Michael P. Sheridan, McDonald D. Dawn, Sheridan & Sheridan, L.L.P., South Hadley, MA, for Plaintiffs.

*MEMORANDUM REGARDING REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Civil Action No. 98–30241: Docket Nos. 60 and 62; Civil Action No. 99–30194: Docket Nos. 29 and 31) and PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT WITH RESPECT TO DEFENDANT DANIEL GRIFFIN'S COUNTERCLAIMS (Civil Action No. 98–30241: Docket No. 64; Civil Action No. 99–30194: Docket No. 33)*

PONSOR, District Judge.

Plaintiffs Diane Kibbe ("Kibbe"), Shirley Gregory ("Gregory"), and Sandra Harrington ("Harrington") (together, "plaintiffs") filed suit against their employer, the United States Postal Service ("USPS"), and against a co-employee, Daniel Griffin ("Griffin"), for injuries arising out of Griffin's alleged sexual harassment over a number of years. Kibbe and Gregory filed their complaint together ("Complaint I"), and Harrington later filed a parallel complaint ("Complaint II"). The cases were consolidated, but the parties were ordered to continue making their filings separately.

Plaintiffs claim that USPS violated Title VII (Counts I and II of Complaint I, and Count I of Complaint II), and claim that Griffin intentionally inflicted emotional distress upon them (Counts IV and V of Complaint I, and Count IV[sic] [1] of Complaint II). Gregory and Harrington claim Griffin maliciously interfered with their employment (Count III[sic] of Complaint I, and Count II of Complaint II), and Gregory claims that Griffin assaulted her (Count III of Complaint I). Griffin filed a counterclaim against plaintiffs, alleging (1) defamation, (2) intentional infliction of emotional distress, (3) tortious interference with advantageous relations; (4) civil conspiracy; and (5) abuse of process. Defendants filed separate motions for summary judgment as to both complaints, and plaintiffs filed for summary judgment as to all of Griffin's counterclaims, creating a total of six motions for summary judgment.

All six motions were referred to United States Magistrate Judge Kenneth P. Neiman, and on December 6, 2001, Judge Neiman issued his Report and Recommendation. In a detailed memorandum, Magistrate Judge Neiman recommended (1) that USPS' motions for summary judgment be allowed as to those portions of Counts I and II of Complaint I, and Count I of Complaint II, that alleged retaliation, and as to Kibbe's claim of constructive

1. As Magistrate Judge Neiman points out, Complaint I has two causes of action specified as "Count III," and Complaint II has no cause of action specified as "Count III;" it skips from "Count II" to "Count IV." The court adopts Judge Neiman's choice of referents and refers to the second cause of action in Complaint I labeled "Count III" as "Count III[sic]," and the cause of action in Complaint II labeled "Count IV" as "Count IV[sic]."

discharge in Count I of Complaint I, but otherwise be denied; (2) that Griffin's motions for summary judgment be allowed as to those portions of Count III[sic] of Complaint I, and Count II of Complaint II, that alleged malicious interference with employment, but otherwise be denied; and (3) that plaintiffs' motions for summary judgment as to Griffin's counterclaims be allowed *in toto.* Only defendants filed Objections to the Report and Recommendation.

After a careful, *de novo* review of the motions, Magistrate Judge Neiman's Report and Recommendation, defendants' objections, and plaintiffs' oppositions to those objections, this court is firmly persuaded that the Report and Recommendation is correct. The scrupulousness of the Report and Recommendation makes extended discussion unnecessary.

In summary, for the reasons stated by Magistrate Judge Neiman, this court has concluded, as to plaintiffs' Title VII claims against USPS, that there is sufficient evidence for a reasonable jury to conclude (1) that a "continuing violation" serial theory protected each plaintiff's claims; (2) that Griffin's actions created a hostile work environment for purposes of Title VII; and (3) that USPS failed to take "prompt and appropriate corrective action," but that no reasonable jury could find on the evidence presented (4) that USPS retaliated against plaintiffs, or (5) that Kibbe was constructively discharged.

As to plaintiffs' claims against Griffin, the court has concluded, for the reasons stated by Magistrate Judge Neiman, that (1) Title VII does not preempt plaintiffs' common law claims; and (2) there is sufficient evidence for a reasonable jury to conclude that Griffin's behavior was intentional, extreme, outrageous, and inflicted severe harm upon plaintiffs [2] but that no reasonable jury could find on the evidence presented (3) that Griffin tortiously or maliciously interfered with Gregory and Harrington's employment or advantageous business relations.

As to Griffin's counterclaims against plaintiffs, the court has concluded, for the reasons stated by Magistrate Judge Neiman, that—Griffin has not produced sufficient evidence to survive summary judgment on his claims of (1) defamation; (2) intentional infliction of emotional distress; (3) tortious interference with advantageous relations; (4) civil conspiracy, and (5) abuse of process. The court will allow summary judgment as to Griffin's defamation claim because it finds that plaintiffs' sexual harassment complaints were privileged, as articulated by Judge Neiman in footnote 23, page 45, rather than because of the defects in Griffin's pleadings.

This privilege has usually been recognized in the context of a defamation claim against the plaintiff's employer. *See, e.g., Foley v. Polaroid Corp.,* 400 Mass. 82, 508 N.E.2d 72 (1987). However, the court finds that the privilege may also be asserted by an employee who, as in this case, publishes a sexual harassment complaint to her supervisors, employer, or to the employer's EEO office, so long as the complaint is (1) "of a kind reasonably calculated to protect or further" the employer's interest in maintaining a workplace free of sexual harassment, and (2) the complaint is not made "recklessly." *Foley,* 508 N.E.2d at 79–80. The interest in a workplace free of sexual harassment will hardly be achieved by recognizing a conditional privilege on the part of the investigating employer, but denying the privilege to the employee who informs her employer of the

2. Griffin's summary judgment memorandum did not contest Gregory's assault claim in Count III of Complaint I, and only cursorily objected to Judge Neiman's finding with respect to it in his Objection to the Report and Recommendation.

harassment in the first place. *See Mathias v. Beatrice Foods Co.,* 23 Mass.App.Ct. 915, 917, 500 N.E.2d 812 (1986) (privilege applied to "fellow employees" as well as employer).

For the reasons set forth above, Magistrate Judge Neiman's Report and Recommendation is hereby ADOPTED. USPS' motions for summary judgment are hereby ALLOWED as to those portions of Counts I and II of Complaint I, and Count I of Complaint II, that alleged retaliation, and as to Kibbe's claim of constructive discharge in Count I of Complaint I, but otherwise DENIED. Griffin's motions for summary judgment are hereby ALLOWED as to Count III[sic] of Complaint I, and Count II of Complaint II, but otherwise DENIED. Plaintiffs' motions for summary judgment as to Griffin's counterclaims are hereby ALLOWED *in toto.* The clerk will set both cases for a status conference.

Separate orders will issue.

*ORDER*

For the reasons stated in the accompanying Memorandum, USPS' motion for summary judgment (Docket No. 62) is hereby ALLOWED as to those portions of Counts I and II, that allege retaliation, and as to Defendant Kibbe's claim of constructive discharge, but is otherwise DENIED. Griffin's motion for summary judgment (Docket No. 60) is hereby ALLOWED as to Count III[sic], which alleges malicious interference with employment, but is otherwise DENIED. Plaintiffs' motion for summary judgment as to Griffin's counterclaims (Docket No. 64) is hereby ALLOWED *in toto.* The clerk will set up a status conference to set a schedule for future proceedings.

*ORDER*

For the reasons stated in the accompanying Memorandum, USPS' motion for summary judgment (Docket No. 33) is hereby ALLOWED as to those portions of Count I that allege retaliation, but is otherwise DENIED. Griffin's motion for summary judgment (Docket No. 29) is hereby ALLOWED as to Count II, but is otherwise DENIED. Plaintiff's motion for summary judgment as to Griffin's counterclaims (Docket No. 33) is hereby ALLOWED *in toto.* The clerk will set up a status conference to set a schedule for future proceedings.

*REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Civil Action No. 98–30241: Docket Nos. 60 and 62; Civil Action No. 99–30194: Docket Nos. 29 and 31) and PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT WITH RESPECT TO DEFENDANT DANIEL GRIFFIN'S COUNTERCLAIMS (Civil Action No. 98–30241: Docket No. 64; Civil Action No. 99–30194: Docket No. 33)*

NEIMAN, United States Magistrate Judge.

Claims of sexual harassment lie at the core of these consolidated cases. Three female employees of the United States Postal Service ("USPS")—Diane Kibbe ("Kibbe"), Shirley Gregory ("Gregory") and Sandra Harrington ("Harrington") (collectively "Plaintiffs")—have sued USPS through the Postmaster General, William Henderson, for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. Plaintiffs have also sued their alleged harasser, Daniel Griffin ("Griffin"), personally, under various common law theories. Griffin, in turn, has filed counterclaims alleging, among other things, the intentional infliction of emotional distress and defamation.

Six separate motions for summary judgment (three from each case) have been

referred to the court for a report and recommendation. *See* 28 U.S.C. § 636(b). For the reasons explained below, the court will recommend that USPS's motions for summary judgment be allowed in part and denied in part; that Griffin's motions for summary judgment be allowed in part and denied in part; and that Plaintiffs' motions for summary judgment with respect to Griffin's counterclaims be allowed in toto.

## I. *Factual Background*

The court will first state the facts in a light most favorable to Plaintiffs, the parties opposing summary judgment in the cases-in-chief. In doing so, the court deems admitted uncontroverted facts of record supplied by Defendants. *See* Local Rule 56.1. With respect to Plaintiffs' summary judgment motions regarding Griffin's counterclaims, the court, where necessary, will state the facts in a light most favorable to Griffin.

### A. *General Facts*

At all times relevant to the complaint, Plaintiffs and Griffin were co-workers in the Maintenance Department of USPS's Bulk Mail Center ("BMC") in Springfield. Kibbe, Harrington and Griffin were custodians. Gregory was a maintenance control technician until January of 1998 when she was transferred to the General Mail Facility ("GMF"). All four individuals worked the "Tour 3" shift, i.e., 3:30 to 11:30 p.m. The facts with respect to each party cover the years 1993, when Griffin joined Tour 3, through 1998, when he was fired for the last time.

### B. *Kibbe*

Kibbe and Griffin initially were "on friendly terms." Kibbe advised Griffin about relationships and "spiritual identity" and introduced him to her sister and her church. In turn, Griffin often assisted Kibbe on job assignments prompting the nickname, created by other co-workers, of "boy toy." Even during this period, however, Kibbe witnessed at least one outburst of temper by Griffin.

Kibbe and Griffin's friendly relationship continued until September of 1994 when Griffin, wearing Army fatigues, returned a salute from Kibbe and her husband by putting "his hand down by his crotch and simulat[ing] masturbation." (Complaint I: Docket No. 67, Exhibit 1 at 19.) Griffin apologized later that night. Kibbe did not regard Griffin's conduct as sexual harassment because "it was the [first] time he had done anything like this." (*Id.* at 26.) Nor did she complain to management or any Equal Employment Opportunity ("EEO") officer about the incident.

In November of 1994, Kibbe witnessed Griffin lose his temper over a job assignment. Kibbe attributed Griffin's anger to his belief that she and Harrington preempted his bidding rights. Kibbe complained to management about Griffin's outburst and, for about the next six months, had limited contact with him. Thereafter, however, Kibbe believed that Griffin launched a vendetta against her:

> On April 20, 1995, at a roll call attended by all custodians, Griffin made what Kibbe viewed as an obscene gesture, rotating his middle finger in front of his face. Kibbe reported this incident to her supervisor but did not file an EEO complaint. Griffin explains that he was just "picking his nose." (*Id.* at 31.)
>
> On September 12, 1995, Griffin grabbed his crotch as Kibbe, Gregory and another employee, Judy Bracci, passed him on their way outside for a cigarette break. Bracci described the gesture as "like a ball player would do." (*Id.*, Exhibit 3 at 19.) As the women passed Griffin on their way back, "he lifted his leg and scratched his buttocks." (*Id.*, Exhibit 1 at 35.) While Kibbe did not see Griffin grab his crotch, she saw the second ges-

ture because she made a point of looking towards him. Kibbe viewed grabbing one's crotch as sexual harassment and scratching one's butt as inappropriate and obscene behavior.

On August 7, 1996, Griffin, who was about twenty-five feet away from Kibbe, put his hand on his crotch and "lifted it up and down ... a couple of times" while walking down the hall towards her. (*Id.* at 39–40.)

Kibbe reported this last incident to her supervisors and, claiming that she could not work under such circumstances, submitted a request for administrative leave. Both Kibbe and Griffin were interviewed separately about the incident and were asked to submit written statements. When Kibbe then went home, she was very nervous, constantly looking out her window for Griffin. When her supervisor later called her,. Kibbe expressed reluctance about returning to work. The supervisor stated that the plant manager did not like her threats and that she was to return to work the next day, which she did. Ultimately, Kibbe filed an EEO complaint with respect to this incident.

Based on Kibbe's complaint, as well as others, USPS management began disciplinary actions against Griffin. Those actions are detailed below. For now, however, the court notes that Griffin was terminated on October 5, 1996, but that following arbitration—at which Kibbe and Harrington both testified—the arbitrator ordered that Griffin be reinstated with back pay. Griffin was out of work until sometime in January of 1997.

Kibbe took a leave to absence from October of 1996 to January of 1997 to adopt a child. When she returned, she was "devastated" to learn that the arbitrator who ordered Griffin's reinstatement found that she lacked credibility. (*Id.* at 58–60.) USPS management offered Kibbe a transfer to the East Longmeadow Post Office, but Kibbe refused, having heard that a supervisor there had been accused of sexual harassment. Neither did Kibbe consider bidding to work a different tour at the BMC because she liked her job. It was "very easy" and, in her words, "why should [she] make a change .. [if she] wasn't causing the problems[?]" (*Id.* at 105.)

Kibbe experienced one further incident involving Griffin before she resigned in September of 1997. On June 6, 1997, while Kibbe was eating supper with a maintenance mechanic, Griffin "grabbed his crotch and then went out of [her] view." (*Id.* at 63.) Griffin was about twenty-five to thirty feet away from Kibbe at the time. Kibbe contacted an EEO counselor about this incident on June 18, 1997, and filed a formal complaint on July 28, 1997.

In the meantime, on June 9, 1997, Kibbe took sick leave, thereby allowing her husband, who had been home caring for their child, to return to work. Kibbe had sought a doctor's note for the leave on June 3, 1997, before the incident with Griffin. Kibbe's supervisor granted three weeks of leave, but placed her on AWOL status when she did not thereafter return to work. After confusion about Kibbe's leave status was corrected, the AWOL designation was removed from Kibbe's file. Notwithstanding her "clean record," she resigned on September 3, 1997, purportedly due to physical and emotional ailments.[3] (*Id.* at 76.) Still, Kibbe contacted an EEO counselor about alleged retaliation and thereafter filed a formal EEO complaint.

3. Her doctor diagnosed her as having chronic fatigue syndrome and later determined that she had been suffering from Lyme's disease since 1994. While Kibbe eventually recovered from Lyme's disease she never returned to work at the USPS.

C. *Harrington*

On November 1, 1994, as indicated, Griffin thought that Harrington and Kibbe had preempted his bidding rights. An angry Griffin called Harrington, who was cleaning the men's locker room, a "cunt." Griffin also dumped a container of trash on the floor, spilling its contents, and then kicked the container. A half hour later, Griffin confronted Harrington and complained that he should have received the bid; he then kicked down chairs and a pile of newspapers. Harrington, offended, intimidated and scared, filed an informal EEO complaint.[4]

On December 9, 1994, an EEO counselor contacted Harrington and stated that she had to sign a settlement form, completed by another individual, which stated that management had rectified the situation. Harrington protested, but signed the form after the counselor indicated that the case could be re-opened at any time if problems persisted.

Things escalated in the latter part of 1997 and after an incident on September 3, 1997—where Griffin clapped two rolls of paper towels behind Harrington's head, snickered and breathed heavily—Harrington began to keep a list of Griffin's actions. The following incidents ensued:

> On September 24, 1997, Griffin pushed his trash receptacle into Harrington's large grey trash receptacle, commonly referred to as a "grey ghost." When Harrington then pushed a button on the compactor, Griffin pulled a bar so that the compactor would shut off. As Harrington attempted to exit the compactor room, Griffin tried to slam the door on her.
>
> On October 2, 1997, Harrington overheard Griffin talking to two co-workers about an article in the newspaper. One worker asked "how could a man kill his two kids and cut them up, and how could you stab a woman ninety-six times?" Griffin responded by staring directly at Harrington and stating, "If you're pushed enough, you could stab somebody that many times." (*Id.* at 57–58.) Harrington felt threatened by Griffin's comment and one of the other workers present told Griffin to stop trying to upset Harrington.
>
> On October 9, 1997, Harrington tried to pass Griffin on their way out to the parking lot after punching out at the end of the shift. Griffin blocked her way with his lunch box.
>
> On November 20, 1997, when Harrington and Griffin were at their lockers, which were forty feet apart, Griffin "put his hands down in front of his crotch and did the jerking motion simulating masturbation." (*Id.* at 77, 81.)
>
> On December 4, 1997, Griffin passed within a foot of Harrington with a trash barrel while she was standing near the bulletin board. Fifteen minutes later, Griffin grabbed his crotch two times in her presence.

Later on December 4, 1997, Harrington gave her supervisor three months' worth of complaints about Griffin. Although Harrington told her supervisor that she did not want him to investigate, he stated that he would have to go "upstairs" because he was not sure how to handle the situation. (Complaint I: Docket No. 77, Exhibit 5 ¶ 9.)

The incidents with Griffin continued:

> On January 9, 1998, Griffin was reading a newspaper in the break portion of the "PSM-4" area near where Harrington

4. Prior to November of 1994, Harrington only spoke with Griffin on two occasions. After that, Harrington decided that she did not want to talk with Griffin anymore as she could not understand him, i.e., he was "out there in another world." (*Id.*, Exhibit 5 at 17.)

> was working. The next day, as Harrington was working with another employee, Bob Hagberg, Griffin entered the area to speak with Hagberg. While Hagberg's head was down, Griffin rubbed his buttocks. Knowing that Hagberg had not been looking at Griffin, Harrington did not complain to Hagberg or ask him if he had seen the gesture.[5]
>
> On March 20, 1998, as Harrington rounded a corner, Griffin came out of a closet and extended a sign he was carrying so that it rubbed Harrington's leg.

Harrington reported this latter incident to her supervisor. When Harrington indicated that there were no other witnesses, the supervisor said he was sorry but that there was nothing he could do since Griffin would deny it. Even so, the supervisor said he would write the incident down. Harrington was so upset that she did not go to work the next day.

The incidents continued:

> On March 24, 1998, as Harrington was dumping trash barrels in the cafeteria, Griffin approached her, looked around, then started breathing hard. He walked five more feet, turned, walked past her again and left.
>
> On April 8, 1998, Griffin knocked on the door of the ladies' locker room before entering. Griffin asked Harrington if she had seen the fan used to dry wet floors, even though fans were not kept in the locker room. Griffin then turned and left without waiting for an answer. Harrington, who took breaks in the locker room where she felt safe, believed that Griffin was trying to show her that she could not hide from him.

On April 9, 1998, Griffin told the acting supervisor about the locker room incident who, in turn, said he would have all custodians informed that they should stay in their work areas.

Still another incident occurred on April 28, 1998, when Griffin rubbed his buttocks as he was walking through Harrington's work area at a distance of about thirty feet. Harrington reported the incident to two managers.

Harrington sought EEO counseling with respect to a number of these incidents on January 22, March 24 and May 1, 1998. In addition to making numerous complaints to her supervisor, union steward and other managers, Harrington filed a formal EEO complaint on July 14, 1998. Harrington remains a USPS employee.

D. *Gregory*

Gregory, a good friend of Kibbe's, worked in a "very stressful" position as a maintenance operations support clerk until the end of 1997. (Complaint I: Docket No. 67, Exhibit 7 at 28–29, 46.) In January of 1998, Gregory transferred to the adjacent GMF-stockroom.

Gregory dates the beginning of her problems with Griffin to a dispute in the summer of 1995 about wearing shorts to work. Gregory had heard that Griffin planned to complain that maintenance control workers, such as herself, were allowed to wear shorts whereas custodians, such as Griffin, were not. On July 10, 1995, Gregory confronted Griffin as they were leaving work and asked why he had "to ruin it for the rest of" the maintenance staff. (*Id.* at 47.) "I was miffed ... [and] had words with him." (*Id.*) Griffin told her to speak to his supervisor if she had a problem.

The next day, July 11, 1995, Griffin "grabbed himself and gave a lift" when he

5. Griffin also entered areas where Harrington was working on four days in February, 1998, and again on March 25, 1998. On all of the occasions in February, Harrington was working in the "PSM-4" area. During that period, other custodians also entered that work area.

passed Gregory in the hall. (*Id.* at 51–52.) Gregory states that she had never seen anyone make that gesture other than "baseball players on T.V." (*Id.* at 52.) Gregory interpreted the gesture as Griffin stating "F --- you." (*Id.* at 52–53.) She was "offended" and "insult[ed]," but also acknowledges that "F --- you" gestures and words were commonplace in the BMC between males and that she herself had probably used the term "F --- you" at work, albeit to herself. (*Id.* at 53–54.) Even so, she had never seen any male other than Griffin make such a gesture towards a woman. Gregory immediately reported the incident to her supervisor.

Other incidents followed:

On September 12, 1995, Gregory was a member of the trio who passed Griffin on their way to a cigarette break. Gregory saw Griffin "grab himself and pull himself up." (*Id.* at 73.) On the way back from the break, Gregory saw Griffin grab his buttocks. Gregory immediately reported the incidents to her union steward who, in turn, reported the behavior to Gregory's supervisor. Bracci and Gregory both prepared reports and, on September 15, 1995, Griffin was placed on emergency suspension. Gregory was told by her supervisor and another manager that she should call the police if she felt threatened by Griffin. Another manager told Gregory that Griffin had a history of violent behavior and that she should not be alone with him.[6]

On October 30, 1995, Gregory nearly collided with Griffin who was pushing a "gray ghost." Although Gregory did not initially view this incident as sexual harassment per se, she believed that there was no reason for Griffin to be moving in her direction other than to hit her. Nonetheless, she soon sought EEO counseling, noting on the counseling form that she was "a female, being sexually harassed." (Complaint I: Docket No. 77, Exhibit No. 8(E).)

On December 11, 1995, as Griffin and Gregory were passing each other, Gregory observed that Griffin's hands were clenched. Gregory filed an informal EEO complaint but did not pursue formal charges.

Although Gregory claims that there were further instances of harassment by Griffin, she avers that she stopped reporting the incidents because nothing was being done to address her prior complaints. Moreover, Griffin claims, she was told by an EEO counselor that her best option was to "bid out."[7]

The incidents between Griffin and Gregory continued:

On January 24, 1997, following his reinstatement, Griffin walked through the maintenance control office with his supervisor. Griffin had apparently done this on other occasions as well. Perturbed, Gregory immediately contacted an EEO counselor and later formally complained.

On March 13, 1997, when Gregory was walking in the USPS parking lot after dark, she saw Griffin's car come out of a parking aisle, turn into the main road-

6. As previously indicated, Griffin received full back pay when he returned from his suspension. On October 3, 1995, Griffin filed a complaint against Gregory, claiming that she was looking at his crotch. After her supervisor officially warned her about the incident, Gregory herself started an EEO proceeding, but dropped it after the supervisor apologized and retracted the warning.

7. Despite the EEO counselor's advice, Gregory did not seek a reassignment. She did not want to relocate and there were no other opportunities available at her pay level except supervising mail processing, a job she did not want to do. When she applied for a change of tour, Gregory states her request was denied because of "needs of service."

way and accelerate and swerve towards her.[8] Gregory immediately notified her supervisor and called the police. When she was scheduled to return to work three days later, on March 16, 1997, Gregory called her supervisor and told him she could not work. The next day, she saw her doctor who told her that her nervous symptoms seemed to be related to Griffin. Gregory filed an informal EEO complaint that same day and stayed out of work until March 23, 1997.

On September 15, 1997, Griffin walked by Gregory, who was talking with a friend, and "grabbed his butt." Although a supervisor was in the area, Gregory did not report the incident to him. She did, however, file an EEO complaint.

On October 1, 1997, Griffin sat at a desk in the maintenance control area while an employee, Dina Palmer, spoke to him about the combined federal campaign. (Palmer routinely used the maintenance control area to solicit donations from maintenance workers.) Gregory asked Griffin's supervisor to have Griffin leave the area, but the supervisor said "no." Gregory stayed out of the area for an hour to ensure that Griffin had left before she returned.

In December of 1997, Gregory bid for a transfer to a stock room position in the GMF and started working there on January 1, 1998. After the transfer, Gregory encountered Griffin on three occasions:

On January 8, 1998, Griffin grabbed his buttocks as Gregory passed him in the BMC. Gregory filed an informal EEO complaint.

On February 16, 1998, Griffin made "exaggeratedly wide sweeps with his wet mop" as he cleaned the lobby floor. (*Id.* at 156.) When Gregory yelled to male employee who was entering the area to let Griffin know she was not alone, he stopped blocking her way.[9]

On February 17, 1998, Gregory saw Griffin grab his buttocks as she followed him down the hall.

Like Harrington, Gregory remains employed by USPS.

E. *Griffin and USPS*

USPS took several disciplinary actions against Griffin before finally terminating him on July 18, 1998.[10] For example, following complaints of Griffin's outburst in November of 1994, USPS management issued a letter of warning and referred Griffin for counseling. However, Griffin filed a grievance and the letter of warning was held in abeyance for six months. USPS also points out that bulletins issued during this time frame made it clear that sexual harassment would not be tolerated.

Other discipline included the following:

In the spring of 1995, following Kibbe's complaint of the obscene gesture Griffin made at roll call, USPS management again referred Griffin for counseling and invoked the earlier letter of warning.

In July of 1995, after Gregory complained about an obscene gesture, USPS management issued another letter of warning to Griffin, which Gregory, as-

8. At her deposition, Gregory initially stated that Griffin swerved to avoid hitting her. She then later stated that he first swerved toward and then away from her. (See Complaint I: Docket No. 67, Exhibit 7 at 124–31, 225.)

9. Two days later, Gregory was informed by a maintenance manager that Griffin had accused her of walking on his wet floor and Gregory was prohibited from going to the BMC at all. As a result of this restriction, other employees had to perform some of Gregory's duties, causing friction.

10. During his employment, Griffin himself filed numerous EEO complaints alleging that Plaintiffs were sexually harassing *him*.

suming it was a first-time offense, viewed as appropriate. In addition, management conducted a sexual harassment training program for custodians on July 15, 1995, which Griffin, Kibbe and Harrington attended. Later that summer, management also referred Griffin for a fitness for duty examination by USPS physicians and a psychiatric examination by an independent psychiatrist. Both physicians concluded that Griffin was fit for duty.[11]

USPS management suspended Griffin without pay from September 15 through September 28, 1995, after Gregory and Kibbe complained of the September 12, 1995 incident. Gregory viewed this suspension as appropriate so long as it was in line with Griffin's other discipline. Griffin received his back pay upon his return.

On August 7, 1996, USPS management placed Griffin on administrative leave followed by a termination. As described, Griffin fought the termination and won reinstatement. The arbitrator found that there was obscene language and conduct occurring on Tour 3 that management had failed to effectively remedy and that management had failed to follow its own disciplinary procedures in terminating Griffin.

USPS management investigated continued complaints after Griffin returned to work in January of 1997, admonished him to stay out of Harrington's work area and proposed mediation, which Harrington refused.

USPS management investigated Gregory's March 1997 report that Griffin had tried to strike her with his car, allowed Gregory to take paid leave for the rest of her shift, and attempted to schedule counseling and mediation.[12]

In 1998, USPS management instituted formal lunch and break schedules and warned all custodial employees that they should remain in their own work areas unless on break. In addition, Gregory's supervisor suggested certain changes to her schedule to reduce the likelihood of encounters with Griffin.[13]

In March of 1998, USPS again required that Griffin undergo two psychological fitness for duty examinations, one by the USPS physician and a second by an independent psychiatrist. As before, both doctors determined that Griffin was fit for duty.

Griffin was terminated on July 18, 1998, following an altercation with his immediate supervisor.

## II. *Procedural Background*

Kibbe and Gregory filed their complaint (hereinafter "Complaint I") on December 28, 1998, and Griffin thereafter filed counterclaims which he amended on September 7, 1999. In the interim, on September 1,

11. The court notes that Griffin did not show up for his initial psychological appointment. When later questioned by supervisors, he stated that he had called "Tinkerbell" to tell them he was not going to the examination. By his supervisors' estimations, Griffin—who spoke of Tinkerbell, Goofy, Peter Pan, hallucinating from taking heroin and "taking a shit"—was "sarcastic or childish ... [and] did not seem to take [the situation] seriously." (Complaint I: Docket No. 77, Exhibit 12.)

12. Although Gregory thought that management's initial response to this incident was appropriate, she felt that mediation was inadequate as Griffin was not willing to attend such a program. One of Plaintiffs' supervisors stated that no manager knew what to do about Gregory's allegations.

13. While Gregory was somewhat relieved with the schedule changes and felt it was an appropriate response to the problem, there was friction when other co-workers had to perform some of her duties. Gregory also felt it was "too little, too late."

1999, Harrington filed her complaint (hereinafter "Complaint II") which substantially parallels Complaint I. Griffin filed counterclaims to Complaint II on January 3, 2000.

The two complaints raise four types of claims: (1) each of the three Plaintiffs alleges that USPS violated Title VII (Counts I and II of the Complaint I and Count I of Complaint II); (2) Gregory alleges that Griffin assaulted her (Count III of Complaint I); (3) Gregory and Harrington allege that Griffin maliciously interfered with their employment (Count III[sic][14] of Complaint I and Count II of Complaint II); and (4) all three Plaintiffs allege that Griffin intentionally inflicted emotional distress upon them (Counts IV and V of Complaint I and Count IV[sic] Complaint II).

Each of Griffin's counterclaims allege five causes of action against Plaintiffs: (1) defamation; (2) intentional infliction of emotional distress; (3) tortious interference with advantageous relations; (4) civil conspiracy; and (5) abuse of process.

On February 29, 2000, District Judge Michael A. Ponsor consolidated the two cases, but ordered that "filings ... be made in each case independently" so that "each file will contain a complete set of documents and the docket sheet will reflect this." (Complaint I: Docket No. 41.)[15] On February 13, 2001, following the completion of discovery, USPS and Griffin filed separate motions for summary judgment and Plaintiffs filed motions for summary judgment with respect to Griffin's counterclaims. All six summary judgment motions have been referred to this court for a report and recommendation. The court, having now reviewed the motions and the volumes of documents filed with respect thereto and having heard oral argument, is poised to offer its recommendation.

### III. *Summary Judgment Standard*

A court may grant summary judgment pursuant to Fed.R.Civ.P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.,* 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla-Burgos v. Hernandez-Rivera,* 108 F.3d 445, 448 (1st Cir.1997) (quoting *Martinez v. Colon,* 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996).

### IV. *Discussion*

There are three distinct categories of motions: (1) USPS's motions for summary

14. Complaint I has two causes of action specified as "Count III"; the second will be referred to herein as "Count III[sic]." In addition, Complaint II has no cause of action specified as "Count III," only a "Count I" a "Count II" and a "Count IV"; the latter count is hereinafter referred to as "Count IV[sic]."

15. Defendants have heeded this admonition while Plaintiffs have often not, thus causing some docketing confusion.

judgment with respect to the Title VII causes of action, i.e., Counts I and II of Complaint I and Count I of Complaint II; (2) Griffin's motions for summary judgment with respect to Counts III through V of Complaint I and Counts II and IV[sic] of Complaint II; and (3) Plaintiffs' motions for summary judgment with respect to Griffin's counterclaims. Each category will be addressed in turn.

A. *USPS's Motions for Summary Judgment*

In its motions, USPS offers five arguments why it should be granted summary judgment on the Title VII causes of action in which it is targeted. The court will address these arguments seriatim.

1. *Whether USPS is Entitled to Summary Judgment on at Least Part of the Title VII Claims Due to Plaintiffs' Alleged Failure to Timely Exhaust Their Administrative Remedies*

Title VII grants the Equal Employment Opportunity Commission ("EEOC") authority to "issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under this section." 42 U.S.C. § 2000e–16(b). Pursuant to this authority, the EEOC has issued regulations which, at all times relevant here, provided, as they do today, that "[a]n aggrieved person must initiate contact with a[n][EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory...." 29 C.F.R. § 1614.105(a)(1) (2001).[16] According to USPS, parts of the Title VII claims are barred by Plaintiffs' failure to comply with this requirement. *See Jensen v. Frank,* 912 F.2d 517, 520 (1st Cir.1990) (plaintiff must timely exhaust EEO remedies in order to pursue Title VII action). In response, Plaintiffs acknowledge that several allegations were not timely presented to an EEO counselor, but nonetheless seek shelter under the "continuing violation" doctrine.

a. *The continuing violation doctrine*

A claimant may recover for incidents arising outside the limitations period if they are part of a continuing violation. The type of continuing violation at issue here, a "serial" violation, involves a number of allegedly similar discriminatory acts which derive from the same discriminatory animus. *Rivera–Rodriguez v. Frito Lay Snacks Caribbean,* 265 F.3d 15, 22 (1st Cir.2001). A serial violation allows a complainant to reach outside the limitations period and claim discrimination for each of the previous acts. *See Sabree v. United Bhd. of Carpenters and Joiners Local No. 33,* 921 F.2d 396, 400 (1st Cir.1990).[17]

The First Circuit has identified several criteria to help gauge the sufficiency of continuing serial violation claims. These include: (1) whether "the subject matter of the discriminatory acts [is] sufficiently similar that there is a substantial relationship between the otherwise untimely acts and the timely acts"; (2) whether "the acts [are] isolated and discrete or [whether] they occur with frequency or repetitively or continuously"; and (3) whether "the acts [are] of sufficient permanence that they should trigger an

16. *See* 29 C.F.R. § 1614.105(a)(1) (1993); 29 C.F.R. § 1614.105(a)(1) (1994); 29 C.F.R. § 1614.105(a)(1) (1995); 29 C.F.R. § 1614.105(a)(1) (1996); 29 C.F.R. § 1614.105(a)(1) (1997); 29 C.F.R. § 1614.105(a)(1) (1998).

17. A second type of continuing violation is a "systemic" violation in which an employer's policy or practice has a discriminatory effect which continues into the allowable statutory time period. *See Rivera–Rodriguez,* 265 F.3d at 21–22. No such allegation presents itself here.

awareness of the need to assert one's rights." *O'Rourke v. City of Providence,* 235 F.3d 713, 731 (1st Cir.2001) (citations and emphasis omitted).

b. *Application*

Although USPS argues that the continuing violation theory does not apply, it does so in a perfunctory manner and without parsing the theory with respect to each allegedly time-barred incident. After reviewing the facts, outlined above, as to each plaintiff, the court believes that a reasonable jury could conclude that each suffered continuing serial violations.

**Kibbe.** In the first EEO complaint Kibbe filed—following the August 7, 1996 incident when Griffin put his hand on his crotch and "lifted it up and down ... a couple of times" while walking toward her—she tellingly stated that "I CAN NO LONGER WORK WITH THIS INDIVIDUAL." (Complaint I: Docket No. 77, Exhibit 4(E).) A reasonable jury could find from this formal complaint that Kibbe finally understood that she had to take her concerns to the next level. As the First Circuit recently affirmed with specific reference to serial violations in sexual harassment cases; plaintiffs "may be 'unable to appreciate that [they are] being discriminated against until [they have] lived through a series of acts and [are] thereby able to perceive the overall discriminatory pattern.'" *O'Rourke,* 235 F.3d at 732 (quoting *Sabree,* 921 F.2d at 402).

To be sure, in the two years prior to making this complaint Kibbe had observed several other gestures on Griffin's part, e.g., a crotch grab, an instance of lost temper and an obscene use of his middle finger. However, Kibbe viewed one of these incidents, when Griffin scratched his buttocks on the September 12, 1995, as simply inappropriate and obscene. Similarly, Griffin did not view a September 1994 incident, when Griffin simulated masturbation, as sexual harassment as it was the first time he had ever done anything of the sort. In addition, Griffin immediately apologized for his conduct.

In the court's view, a reasonable jury could conclude that these prior instances were not "of sufficient permanence that they should [have] trigger[ed] an awareness of the need to assert [her] rights." *O'Rourke,* 235 F.3d at 731 ("While sometimes these issues may be resolved as a matter of law, they are often better resolved by juries, with jurors reflecting the lessons from their own life's experiences.") When viewed together, these earlier incidents could reasonably be found to be only the beginning of a continuing serial violation for which a claim can now be pursued.[18]

**Harrington.** USPS does not appear to challenge Harrington's reliance on the continuing serial violation doctrine. (See Complaint I: Docket No. 69 (USPS's Brief) at 32 (stating that "the long gap between the events of 1995 and the later EEO complaints ... prevents *Kibbe* and *Gregory* from using the continuing violation doctrine....") (emphasis added).) This is a wise choice since, as USPS acknowledges, Harrington immediately filed an informal EEO complaint after her first encounter with Griffin on November 1, 1994.[19] At the very least, it appears from the arguments presently made that Har-

18. It is also noted that USPS does not argue that several other EEO complaints filed by Kibbe in 1997 should be time barred.

19. USPS hints, but never argues, that this timely complaint may have expired, perhaps when Harrington signed a settlement form. Nor does USPS specifically argue that Harrington, having once complained, had a duty to seek EEO counseling within forty-five days of any future incident.

rington should be allowed to submit her continuing serial violation theory to a jury.

**Gregory.** As for Gregory, it appears that she began seeking EEO counseling in October or November of 1995, only a few months after Griffin allegedly began making obscene gestures towards her. Moreover, it appears that she immediately reported each of the early incidents to either her supervisor or union steward.

To be sure, not all of Gregory's complaints technically meet the forty-five day limit. However, like Kibbe, the pattern of behavior directed at Gregory could reasonably be interpreted as a series of incidents which, when added together, formed the basis of a continuing serial violation. As with Kibbe, Gregory may have been unable to appreciate that she was being discriminated against until she had lived through a series of events.

At bottom, viewed in a light most favorable to Plaintiffs, the court believes that a jury should determine whether a continuing serial violation theory protects each plaintiff. As the First Circuit stated in *O'Rourke,* "a court should not hastily dismiss on timeliness grounds a harassment claim where a continuing violation is alleged." *Id.* at 727. Accordingly, the court will turn to the USPS's more substantive arguments.

2. *Whether Griffin's Actions Constitute Title VII Hostile Work Environment Sexual Harassment*

USPS argues that Griffin's actions do not constitute hostile work environment sexual harassment as a matter of law. For an environment to be actionable under Title VII, USPS asserts, the harassment must be "sufficiently severe or pervasive to alter the conditions of the [plaintiffs'] employment and create an abusive working environment." *White v. New Hampshire Dep't of Corrections,* 221 F.3d 254, 259 (1st Cir.2000). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment," *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), considering the totality of the circumstances in each case, *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Moreover, the "sexually objectionable environment must be ... one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275.

USPS maintains that Plaintiffs' claims fail "on all fronts." Alternatively, USPS argues that even if Griffin's conduct was sufficiently severe, his behavior is not actionable under Title VII as it was not directed at Plaintiffs on the basis of their gender. *See Johnson v. Hondo, Inc.,* 125 F.3d 408, 412 (7th Cir.1997); *Landrau Romero v. Caribbean Restaurants, Inc.,* 14 F.Supp.2d 185, 189 (D.P.R.1998).

The court believes, as Plaintiffs argue, that the incidents over the multi-year period described above could convince a reasonable jury that a hostile or abusive working environment was directed at Plaintiffs. Again, viewing the facts in a light most favorable to Plaintiffs, a reasonable jury could find that each Plaintiff endured years of sexually objectionable gestures, comments and bizarre, if not violent, behavior by Griffin. While it is true that some of the conduct was not overtly sexual, the court, as the First Circuit recently explained, should "avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct." *O'Rourke,* 235 F.3d at 730. "[S]uch an approach not only ignores the reality that incidents of nonsexual conduct ... can in context contribute to a

hostile working environment, it also nullifies the harassing nature of that conduct." *Id.* It also "defies the [Supreme] Court's directive to consider the totality of the circumstances in each case and robs the incidents of their cumulative effect." *Id.* (citations and internal quotation marks omitted).

In addition, there is more than an implication that Griffin's conduct was directed at Plaintiffs *on the basis of their gender.* Unlike those cases cited by USPS, none of the evidence proffered here suggests that Griffin's conduct was directed at men. *Compare, e.g., Landrau Romero,* 14 F.Supp.2d at 190 (dismissing male employee's hostile environment claim where alleged harasser's behavior was exhibited in front of both sexes and, in fact, the "most outlandish behavior, grabbing his genitals," was directed as an insult to female employees). Accordingly, the court suggests that USPS is not entitled to summary judgment on the basis of this particular argument.

3. *Whether USPS Took Prompt and Appropriate Corrective Action*

USPS also argues that Plaintiffs' Title VII claims fail because it took "prompt and appropriate corrective action" as soon as it reasonably should have known of Griffin's conduct. *White,* 221 F.3d at 261 (holding that employer is liable for harassment caused by a co-employee "if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action") (citation and internal quotation marks omitted). In response, Plaintiffs contend that the promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve, *see id; Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999), and that, here, a reasonable jury could conclude that USPS's response to Griffin's actions was too little, too late.

To USPS's credit, there is a record of remedial action. Even before Griffin's final termination, which appears somewhat unrelated to Plaintiffs' complaints, Griffin had been suspended for a few days and fired for a few months, only to have an arbitrator reinstate him with back pay. Moreover, as USPS points out, letters of warning were placed in Griffin's file and he was eventually ordered to undergo physical and psychological evaluations.

Even so, the court believes that a reasonable jury could find USPS's responses to be inappropriate or unjustifiably delayed. The court itself is struck by the sheer number of things Griffin is said to have done which were consistently reported to a supervisor or a manager, yet the situation took years to resolve. For example, Kibbe's supervisor was unable to get anyone from upper management to promptly return his calls with regard to the June 6, 1997 crotch-grabbing incident. It also appears that at least one reason the arbitrator ordered Griffin reinstated following his initial termination in October of 1996 was because USPS management had failed to follow its own disciplinary procedures. The arbitrator found as well that there was obscene language and conduct occurring on Tour 3 that management had failed to effectively remedy.

Plaintiffs also make a persuasive argument that USPS could have transferred Griffin but did not. Admittedly, USPS's Manager of Labor Relations for the Springfield office has averred that it would violate the union contract to unilaterally transfer or reassign a maintenance employee to a different position, tour, schedule or facility without following the seniority-based bidding procedures set forth in the union contract. (Complaint I: Docket No. 67, Exhibit 8 ¶ 3.) However, as Plaintiffs point out, the contract also gave USPS the "*exclusive right,* subject to the

provisions of the Agreement and *consistent with applicable laws and regulations* [,] ... *to* hire, promote, *transfer, assign,* and retain employees in positions within the [USPS] and to *suspend, demote, discharge, or take other disciplinary action against such employees.*" (Complaint I: Docket No. 77, Exhibit 9 (emphasis added).) Clearly, Plaintiffs did not bargain away their right to be free from sexual harassment in employment, *see Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 51–52, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (holding that Title VII rights may not be prospectively waived by a collective bargaining agreement), and the possibility of a transfer could be one of the factors a jury might consider in assessing USPS's potential liability.[20]

Finally, Plaintiffs have culled from this history some disturbing managerial responses to Plaintiffs' complaints about Griffin: "[G]ive [Griffin] enough rope and he'll hang himself."; "Well, maybe this never happened[;] it's his word against yours."; "[Y]our complaints do not appear to be valid since you have no witnesses[.] I think people are feeding you information about Griffin that you are acting upon."; "[T]here is nothing I can do[.][I]f I ask Griffin about it he will deny it."; "It's 4:30[.] I'm going home."; "Griffin might have jock itch because I have seen him grab his crotch on several occasions." (Complaint I: Docket No. 76 (Plaintiffs' Statement of Facts) at 30–31.) While more context for these comments would be helpful, they do bear on the factual determination of whether USPS's responses to Plaintiffs' complaints were genuine, let alone prompt and appropriate. Indeed, one manager told Gregory that Griffin had a history of violent behavior and that she should not be alone with him, and another supervisor stated that no manager knew what to do about Gregory's allegations.

In sum, the court recognizes that USPS investigated and took certain actions with respect to complaints against Griffin. It also fired him, albeit for reasons apparently unrelated to sexual harassment. Nonetheless, the court believes that the question of "prompt and appropriate" action in this case should not be prematurely taken from the jury. Like the plaintiff in *Smith v. St. Louis Univ.,* 109 F.3d 1261 (8th Cir.1997), Plaintiffs "should have the opportunity to argue to a jury that the [USPS's] response was not prompt enough (given all the circumstances), and thus made it not [appropriate] for some reason." *Id.* at 1265.

4. *Whether the Facts Support a Title VII Retaliation Claim Against USPS*

USPS's fourth argument addresses a separate Title VII theory under which Plaintiffs are proceeding, retaliation. Here, USPS's position has significant merit.

A prima facie case of Title VII retaliation requires a plaintiff to "demonstrate that: (1)[she] engaged in protected conduct under Title VII; (2)[she] suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity." *Hernandez–Torres v. Intercontinental Trading, Inc.,* 158 F.3d 43, 47 (1st Cir.1998). To defeat summary judgment, the plaintiffs must point to some evidence of retaliation by a pertinent decision maker. *See Randlett v. Shalala,* 118 F.3d 857, 863 (1st Cir.1997).

**20.** In this vein, the jury might also consider the propriety of managerial suggestions to at least two of the plaintiffs, Kibbe and Gregory, that they seek reassignment or transfer. Similarly, the jury might consider that, when Gregory finally sought a change of tour, her request was denied.

Here, USPS asserts, Plaintiffs can make no such showing.

The court is of the opinion that Plaintiffs' retaliation claims are impermissibly thin. Assuming that "toleration of harassment by other employees" is an adverse employment action, as Plaintiffs claim, it is impossible to see how USPS is causally connected to retaliating against Plaintiffs for engaging in protected activities. Plaintiffs provide no persuasive evidence in this regard. At most, Kibbe hints that there may have been an atypical response by USPS to her 1997 sick leave, but this issue is not actively pursued. *See Rivera-Cotto v. Rivera,* 38 F.3d 611, 615 (1st Cir.1994) ("To forestall summary judgment, we require more than unsubstantial conclusions, backed by only a few uncoordinated evidentiary fragments.") (citation and internal quotation marks omitted). Accordingly, the court will recommend that USPS be granted summary judgment with respect to those portions of Counts I and II of Complaint I and Count I of Complaint II which allege Title VII retaliation.

5. *Whether USPS "Constructively Discharged" Kibbe*

Finally, USPS challenges Kibbe's Title VII cause of action insofar as she claims she was constructively discharged. The test for constructive discharge is whether "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Greenberg v. Union Camp Corp.,* 48 F.3d 22, 26–27 (1st Cir.1995) (citations and internal quotation marks omitted). As the USPS points out, however, "[l]oss of prestige, humiliation, and embarrassment do not amount to a constructive discharge unless extreme." *Mahoney v. Driscoll,* 727 F.Supp. 50, 51 (D.Mass.1989) (citing *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 120 (1st Cir.1977)).

The court agrees with USPS that Kibbe's constructive discharge claim should fail. Even assuming that her working conditions were "extremely embarrassing," as she alleges, the undisputed facts show that it was a medical condition, Lyme's disease, that caused her to resign. Indeed, Kibbe sought her physician's support for such a medical leave *before* June 6, 1997, the date of the final incident she now claims drove her to quit. Thus, to the extent that Count I of Complaint I also alleges constructive discharge, the court will recommend that summary judgment enter in favor of USPS.

B. *Griffin's Motions for Summary Judgment*

The court will now address Griffin's summary judgment arguments with respect to each of the common law claims targeting him. First, however, the court will consider Griffin's threshold argument that all of the counts directed at him should be dismissed because Title VII provides Plaintiffs' exclusive remedy.

1. *Title VII Exclusivity*

According to Griffin, Title VII is a federal employee's "exclusive remedy" for discrimination in the workplace. *See Brown v. Gen. Services Admin.,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Since Plaintiffs' common law claims against him are based on the same factual allegations as the Title VII counts, Griffin argues, under *Brown* they are unavoidably foreclosed. In opposition, Plaintiffs assert that they are able to sue Griffin for common law violations irrespective of *Brown.*

As will be described, the court agrees with Plaintiffs with respect to two of the three common law claims against Griffin, Gregory's claim of assault and all three

Plaintiffs' claims that Griffin intentionally inflicted emotional distress upon them. Those claims, in the court's view, are highly personal causes of action which are not foreclosed by Title VII's exclusivity principles.

The question might be closer with respect to Plaintiffs' third common law claim against Griffin, namely, that he maliciously interfered with their employment, a claim that is somewhat akin to their employment discrimination causes of action. However, given the court's recommendation below that this claim fails on its merit, the court finds it unnecessary to address Griffin's Title VII exclusivity argument with respect thereto.

The First Circuit Court of Appeals has interpreted Title VII as supplementing, not supplanting, existing rights. *See Ramos v. Roche Products, Inc.*, 936 F.2d 43, 50 (1st Cir.1991) (citing *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47–49, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)). In this spirit, district judges in this circuit have held that, *Brown* notwithstanding, Title VII does not preclude a federal employee's common law claim against a co-worker or other non-employer defendant. *See Bergeron v. Henderson,* 185 F.R.D. 10, 16 (D.Me.1999) (concluding that *Brown* does not preclude a state-law human rights claim against non-employer defendant); *Douglas v. Coca-Cola Bottling Co. of Northern New England, Inc.*, 855 F.Supp. 518, 521 (D.N.H.1994) (citing *Ramos* and concluding that federal employee's claims for wrongful discharge and breach of implied covenant of good faith and fair dealing survive Title VII exclusivity argument); *Wood v. United States,* 760 F.Supp. 952, 956–57 (D.Mass.1991) (holding that common law claims of assault and battery survive co-worker's Title VII exclusivity argument), *aff'd,* 995 F.2d 1122 (1st Cir.1993). As Senior District Judge Walter J. Skinner, quoting a decision from the District of Columbia district, has observed:

> "*Brown* did not address the question of Title VII's preemptive effect on discrimination suits brought against individual officers for damages.... *Brown* was decided on the basis of the sovereign immunity doctrine, a doctrine that curtails the ability of claimants to obtain official relief *against the federal government,* including relief taking the form of retroactive promotion and back pay.... Sovereign immunity serves to protect the federal government from unconsented suits that go to invading the public treasury and mandating governmental action .... But the doctrine does not extend to protect government officers from personal liabilities arising out of their official activities.... Taking the Federal Tort Claims Act as a model, it emerges that waivers of sovereign immunity do not in and of themselves affect preexisting remedies available against individual officials.... Since nothing in Title VII reveals an intent to disturb avenues of relief against discriminating officials in their personal capacities, *Brown's* preemption rule stands circumscribed to the extent of cutting off only official remedies for federal employment discrimination."

*Wood,* 760 F.Supp. at 956 (quoting *Neely v. Blumenthal,* 458 F.Supp. 945, 952–55 (D.D.C.1978)) (emphasis added by Judge Skinner).

To be sure, Griffin's argument is not without some support. *See, e.g., Mathis v. Henderson,* 243 F.3d 446, 449–50 (8th Cir.2001) (reading *Brown* broadly and concluding that postal employee's common law claims against supervisor, which were based on same set of facts as Title VII claims, were preempted by Title VII); *Rivera v. Heyman,* 157 F.3d 101, 105 (2nd Cir.1998) (stating that to allow

discrimination claims based on state human rights statutes to proceed against coworkers would permit federal employee plaintiff to evade *Brown*); *Pfau v. Reed,* 125 F.3d 927, 933–34 (5th Cir.1997) (reasoning that Title VII precludes state law claims for intentional infliction of emotional distress against plaintiff's supervisors).[21] However, the more persuasive position, in this court's view, is the one espoused by Judge Skinner and a host of other circuit and district courts, namely, that "Title VII is not the exclusive remedy for federal employees who suffer 'highly personal' wrongs" by co-employees. *Brock v. United States,* 64 F.3d 1421, 1423 (9th Cir. 1995) (holding that "[w]hen harms involve something more than discrimination," e.g., "defamation, harassing phone calls, and physical abuse," the plaintiff "can bring a separate claim" against the individual perpetrator). *See also Owens v. United States,* 822 F.2d 408, 410–11 (3rd Cir.1987) (allowing plaintiff to maintain Title VII claim against head of Veterans Administration as well as constitutional and common law claims of verbal and sexual harassment against co-employee); *Wallace v. Henderson,* 138 F.Supp.2d 980, 985–86 (S.D.Oh.2000) (concluding that claim against individual for intentional infliction of emotional distress not preempted by Title VII to extent it sought redress for highly personal injury beyond discrimination or retaliation); *Brunetti v. Rubin,* 999 F.Supp. 1408, 1411–12 (D.Colo.1998) (holding that plaintiff may simultaneously seek redress for violation of Title VII against Internal Revenue Service and common law tort claims against co-employee); *Stewart v. Thomas,* 538 F.Supp. 891, 893 (D.D.C. 1982) (concluding that federal employee who brings Title VII claim is not precluded from suing for a highly personal violation, e.g., assault, battery and intentional infliction of emotional distress, that goes beyond discrimination). *Cf. Weberg v. Franks,* 229 F.3d 514, 522 n. 7 (6th Cir. 2000) (noting that while individual public employees cannot be sued under Title VII, individual liability is permitted under 42 U.S.C. § 1983); *Ethnic Employees of Library of Congress v. Boorstin,* 751 F.2d 1405, 1414–16 (D.C.Cir.1985) (allowing federal employees to sue employers "for constitutional violations against which Title VII provides no protection at all").

Although the First Circuit itself has not addressed the issue, it has indicated, as described, that Title VII supplements, but does not supplant, existing rights. *See Ramos,* 936 F.2d at 50. More recently it has acknowledged the " 'major expansion' " of relief available to victims of employment discrimination in light of 1991 amendments to Title VII. *DeNovellis v. Shalala,* 124 F.3d 298, 306–07 (1st Cir. 1997) (quoting *Landgraf v. USI Film Prods.,* 511 U.S. 244, 254–55, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Thus, it is not hard to suggest that Plaintiffs, as federal employees, should be able to bring such personal claims as assault and intentional infliction of emotional distress claims against an allegedly harassing co-employee. In short, the court does not believe that Griffin's exclusivity argument entitles him to summary judgment on Plaintiffs' intentional infliction of emotional distress claims or on Gregory's claim of assault.

2. *Malicious Interference with Employment*

Count III[sic] of Gregory's complaint and Count II of Harrington's complaint

21. The Supreme Court granted certiorari in *Pfau,* vacated the judgment and remanded "for further consideration in light of" two recently decided Supreme Court cases. *Pfau v. Reed,* 525 U.S. 801, 801, 119 S.Ct. 32, 142 L.Ed.2d 24 (1998). On remand, the Fifth Circuit "reinstate[d]" that part of its opinion cited here. *Pfau v. Reed,* 167 F.3d 228, 229 (5th Cir.), *cert. denied,* 528 U.S. 813, 120 S.Ct. 49, 145 L.Ed.2d 43 (1999).

purport to raise common law claims of "malicious interference with employment." Plaintiffs, however, cite no decision recognizing this particular cause of action by the Massachusetts courts. This might be reason enough to grant Griffin summary judgment with respect to these causes of action. *See Martel v. Stafford*, 992 F.2d 1244, 1247 (1st Cir.1993) (cautioning that plaintiffs who choose a federal forum "may not expect the federal court to steer state law into unprecedented configurations") (citations omitted).

Still, Griffin addresses these counts as if they make claim to an "intentional interference with Gregory and Harrington's employment contracts." To prevail on such claims, Griffin argues, a "plaintiff must prove that (1) she had an employment contract with [a third party], (2) [the defendant] knowingly induced [the third party] to break the contract, (3) [the defendant]'s interference, in addition to being intentional, was improper in motive or means, and (4) she was harmed by [the defendant]'s actions." *Shea v. Emmanuel College*, 425 Mass. 761, 682 N.E.2d 1348, 1350–51 (1997). According to Griffin, however, Gregory and Harrington at least have remained continuously employed by the USPS and, therefore, cannot satisfy that part of the second element which requires each to prove that her employment "contract" was "br[o]k[en]."

Were the court to consider these claims as alleging, as Griffin suggests, an intentional interference with Gregory and Harrington's employment contracts, Griffin should likely prevail. Plaintiffs do not claim that their employment contracts were broken. Moreover, Plaintiffs' counsel conceded at oral argument that there was no evidence that Griffin "induced" USPS to take a particular action. Without either a broken contract or inducement, the cause of action for intentional interference with employment contracts does not lie. *See Shea*, 682 N.E.2d at 1350–51.

Plaintiffs, however, take yet another tack. Rejecting Griffin's characterization of Gregory and Harrington's causes of action as intentional interference with employment contract claims, they argue that they really meant to sue Griffin for "interference with [their] advantageous business relations." Such claims, Plaintiffs insist, do not require the existence of an employment contract. Rather, they argue, Gregory and Harrington must each merely "prove that (1)[s]he had a business relationship for economic benefit with [USPS], (2) [Griffin] knew of the relationship, (3) [Griffin] interfered with the relationship through improper motive or means, and (4)[her] loss of advantage resulted directly from [Griffin's] conduct." *Kurker v. Hill*, 44 Mass.App.Ct. 184, 689 N.E.2d 833, 838 (1998) (citations omitted).

Gregory and Harrington's recharacterization of their causes of action as "interference with advantageous business relations" is not inappropriate.[22] As so framed, Gregory and Harrington need not assert that their employment contracts were bro-

22. The counts themselves can reasonably be read to assert the essential elements of such a claim: that each woman had a business relationship with USPS for economic benefit (they were employees); that Griffin knew of the relationship (he was a co-employee who worked with them); that Griffin interfered with the relationship through improper motive or means (he "maliciously intend[ed] and design[ed] to injure [each woman] in her place of work"); and that each woman's loss of advantage resulted directly from Griffin's conduct ("[b]y reason [ ]of" Griffin's actions, each woman "was ... adversely affected in the conditions of her employment"). (Complaints ¶¶ 94–97.) Moreover, Griffin himself has acknowledged that Gregory and Harrington's claims for "malicious interference with employment" are "[o]therwise known as" claims for "interference with advantageous relations." (Complaint I: Docket No. 70 (Griffin's Brief) at 20 n. 8.)

ken, *see McNamee v. Jenkins,* 52 Mass. App.Ct. 503, 754 N.E.2d 740, 745 (2001) ("It is not necessary that the business relationship be one to which the plaintiff is contractually entitled."), nor need they prove inducement.

The problem with Plaintiff's argument, however, is that there is absolutely no evidence that either Gregory or Harrington actually suffered any damages, the "loss of advantage result[ing] directly from [Griffin's] conduct," *Kurker,* 689 N.E.2d at 838, a required element of a claim for interference with advantageous relations. *See, e.g., Adams v. Stephenson,* 116 F.3d 464, 1997 WL 351633, at *2–3 (1st Cir. 1997) (unpublished) (citing *Sharratt v. Housing Innovations, Inc.,* 365 Mass. 141, 310 N.E.2d 343, 348 (1974) and 37 Joseph Nolan & Laurie Sartorio, *Massachusetts Practice—Tort Law* § 98, at 133 (1989)). Gregory alleges only that Griffin made false accusations to her employer, thus *threatening* her job, and Harrington alleges only that Griffin's actions on March 20, 1998, were so upsetting that she unilaterally decided to stay home from work the following day. Strikingly absent is any allegation that a business advantage or any other privilege of employment was lost.

Accordingly, the court will recommend that summary judgment on Count III[sic] of Complaint I and Count II of Complaint II enter in Griffin's favor. *See Adams, supra* (concluding that complaint fails to state claim under Massachusetts law for interference with advantageous business relations where plaintiffs pled no loss of advantage); *Smith & Croyle, LLC v. Ridgewood Power Corp.,* 111 F.Supp.2d 77, 84–85 (D.Mass.2000) (granting defendant summary judgment on interference with advantageous business relationship claim because plaintiffs' suffered no actual "loss of advantage").[23]

3. *Intentional Infliction of Emotional Distress*

Counts IV and V of Complaint I and Count IV[sic] of Complaint II allege that Griffin intentionally inflicted emotional distress upon each of the Plaintiffs. In his motion for summary judgment, Griffin argues that not one of the plaintiffs has a reasonable expectation of proving that his conduct was sufficiently "extreme and outrageous" or that the resulting emotional distress was "severe." *See Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315, 318–19 (1976) (outlining elements of intentional infliction of emotional distress).

After reviewing the extensive evidence proffered, the court is of the opinion that there are enough facts—e.g., frequent instances of simulated masturbation, sexual language and buttocks rubbing—which, if proven, would allow, albeit not require, a reasonable jury to conclude that Griffin's conduct was extreme and outrageous with respect to each plaintiff. *See Boyle v. Wenk,* 392 N.E.2d 1053, 1056–57 (Mass. 1979) ("There is an issue for the jury if reasonable people could differ on whether the conduct is extreme and outrageous.") (citation and internal quotation marks omitted). There is also sufficient evidence, in the court's view, for a reasonable jury to conclude that the emotional distress suffered by each plaintiff was severe. For example, Gregory claims to have suffered physical symptoms such as diarrhea, nervousness and anxiety, Kibbe and Harrington had to take time off, and Harrington had to hide in the ladies' locker room during her breaks in order to avoid Griffin.

23. As a consequence of this recommendation, the court does not address Griffin's alternative statute of limitations argument with respect to Harrington's malicious interference with employment claim.

*See Cady v. Marcella,* 49 Mass.App.Ct. 334, 729 N.E.2d 1125, 1132,, *rev. denied,* 432 Mass. 1107, 737 N.E.2d 467 (2000). Accordingly, the court will recommend that Griffin's motion with respect to these claims be denied.

4. *Assault*

Griffin does not seek summary judgment with respect to Gregory's claim in Count III of Complaint I, that "Griffin assaulted ... [her] by willfully and maliciously aiming his motor vehicle at [her] and threatening to hit her with his moving motor vehicle." (Complaint I ¶ 92.) Accordingly, the court will not consider it further.

C. *Plaintiffs' Motions for Summary Judgment on Griffin's Counterclaims*

For their part, Plaintiffs seek summary judgment with respect to Griffin's five counterclaims. The factual allegations in Griffin's counterclaims against Kibbe are as follows:

> On several occasions, beginning in 1995 and continuing through 1998, ... Kibbe ... complained to [Griffin]'s supervisors and other superiors of [USPS] that [Griffin] had harassed her and had made sexually explicit comments and obscene gestures towards her while at work. These complaints made to [Griffin]'s employer were false and frivolous and specifically designed to inflict severe emotional distress and to interfere with [Griffin's] employment with [USPS].
>
> On several occasions, beginning in 1995 and continuing through 1998, ... Kibbe ... made several complaints to the Equal Employment Officer for [USPS] alleging that ... Griffin had sexually harassed her.... Kibbe pursued administrative complaints and eventually filed this civil suit based on her allegations of sexual harassment by [him]. These complaints made to the administrative agency or its designated representative and the allegation's forming the basis of Kibbe's claims against Griffin are false and frivolous and specifically designed to inflict severe emotional distress and to interfere with [Griffin's] employment with [USPS].

(Complaint I: Docket No. 25 (Griffin's Counterclaims) ¶¶ 7–8, 14.) Virtually identical language is directed at Gregory and Harrington. (See *id.* ¶¶ 9–11, 14; Complaint II: Docket No. 2 (Griffin's Counterclaims) ¶¶ 6–8, 11.) Griffin adds no significantly different evidence in his opposition to Plaintiffs' motions for summary judgment. The court will consider the counterclaims in turn.

1. *Intentional Infliction of Emotional Distress*

Plaintiffs first argue that Griffin's intentional infliction of emotional distress counterclaims are preempted by the exclusivity provision of the Massachusetts Workers Compensation Act ("WCA"), Mass.Gen.L. ch. 152, § 24. The court, however, does not address that issue—nor the related question of whether Plaintiffs' conduct was either within the scope of their employment or in furtherance of the USPS's interests—since, as Plaintiffs also argue and as the court agrees, the elements of Griffin's emotional distress counterclaims, even if not preempted, cannot be met as a matter of law.[24]

To prevail on his intentional infliction of emotional distress counterclaims, Griffin must prove that Plaintiffs

24. Thus, it is also not necessary to address Griffin's alternative assertion, unsupported by caselaw yet unrebutted by Plaintiffs, that the WCA does not apply to federal employees since it specifically exempts "persons employed by an employer engaged in interstate or foreign commerce...." Mass.Gen.L. ch. 152, § 1(4)(f).

"(1) intended to inflict emotional distress [on him] by (2) undertaking actions that were extreme and outrageous, thereby (3) causing emotional distress which (4) was severe." *Flibotte v. Pennsylvania Truck Lines, Inc.*, 131 F.3d 21, 27 (1st Cir.1997) (citations omitted). However, "[i]t is a well-settled principle that a party cannot be liable if it does no more than 'insist upon [her] legal rights in a permissible way, even though [she] was well aware that such insistence is certain to cause emotional distress.'" *Id.* (quoting *Restatement (Second) of Torts,* § 46 cmt. g (1965)). That latter principle carries the day here.

Griffin's emotional distress claims arise solely from Plaintiffs insisting upon their legal rights in a permissible way, that is, by making "complaints" to their "supervisors[,] ... other superiors of [USPS]" and "the Equal Employment Officer for [USPS]." (Complaint I: Docket No. 25 ¶¶ 7–10; Complaint II: Docket No. 2 ¶¶ 6–7.) Accordingly, Plaintiffs cannot be liable for any emotional distress Griffin may have suffered as a result.

In this regard, the court also believes that, under no circumstances, can Plaintiffs' actions be deemed "extreme and outrageous." *See Flibotte,* 131 F.3d at 27 ("Under Massachusetts law, 'extreme and outrageous conduct' is behavior that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'") (quoting *Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72, 82 (1987)). Plaintiffs were simply asserting their administrative rights, if not obligations. Finally, Griffin's claim of emotional distress is conclusory at best and he has presented no evidence that any emotional distress he may have suffered was "severe," notwithstanding his obligation, under *Agis,* supra, to make such a showing. Accordingly, the court will recommend that summary judgment enter in Plaintiffs' favor with respect to Griffin's intentional infliction of emotional distress counterclaims.

2. *Defamation*

Each of Griffin's counterclaims also alleges defamation. "The elements of a defamation claim include (1) a false and defamatory communication (2) of and concerning the plaintiff which is (3) published or shown to a third party." *Dorn v. Astra USA,* 975 F.Supp. 388, 396 (D.Mass.1997) (citing *McAvoy v. Shufrin,* 401 Mass. 593 [597], 518 N.E.2d 513, 517 (1988)). The burden of proving the essential elements of a defamation claim is on the party bringing the claim. *See Veilleux v. Nat'l Broadcasting Co.*, 206 F.3d 92, 117 (1st Cir.2000). Without such proof, summary judgment should enter in favor of the moving party. *See Pardo Hernandez v. Citibank, N.A.*, 141 F.Supp.2d 241, 245–46 (D.P.R.2001); *Croslan v. Housing Auth. for City of New Britain,* 974 F.Supp. 161, 171 (D.Conn.1997).

It should also be noted "[t]he Massachusetts Supreme Judicial Court has stated that defamation traditionally is a disfavored action, and that 'courts have applied a stricter standard to complaints for defamation by requiring defamation plaintiffs to plead the elements of their claims with specificity.'" *Dorn,* 975 F.Supp. at 395–96 (quoting *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 583 N.E.2d 228, 231 n. 7 (1991)) (further citations omitted). Thus, to survive a motion to dismiss, and per force a motion for summary judgment, "a defamation plaintiff must plead: (1) the general tenor of the libel or slander claim, along with the precise wording of at least one sentence of the alleged defamatory statement(s); (2) the means and approximate dates of publica-

tion; and (3) the falsity of those statements." *Id.* at 396 (citing cases).

In the case at bar, the court believes that Griffin has not met these pleading, let alone evidentiary, requirements. At best, Griffin alleges the "general tenor" of his defamation claims and that certain, unspecified statements to Plaintiffs' superiors and EEO officers were false and maliciously made. The counterclaims, however, do not offer "the precise wording of at least one sentence of the alleged defamatory statements" nor "the means and approximate dates of publication." More importantly for purposes here—even though Plaintiffs have appended what they believe might be some of the allegedly defamatory statements (e.g., administrative complaints and notes to supervisors)—Griffin himself proffers no further facts in his summary judgment papers despite the fact that discovery has been completed. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548 (holding that summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Accordingly, the court will recommend that summary judgment enter in Plaintiffs' favor on Griffin's defamation counterclaims.[25]

3. *Tortious Interference with Advantageous Relations*

Each of Griffin's counterclaims also alleges tortious interference with advantageous relations. As described above with respect to similar claims made by Plaintiffs, Griffin, to succeed on such counterclaims, "must prove that (1) he had a business relationship for economic benefit with [USPS], (2) [Plaintiffs] knew of the relationship, (3) [Plaintiffs] interfered with the relationship through improper motive or means, and (4) [Griffin]'s loss of advantage resulted directly from [Plaintiffs]' conduct." *Kurker,* 689 N.E.2d at [838].

The court believes that no reasonable jury could conclude that Plaintiffs' alleged interference with Griffin's relationship with USPS was "improper." As indicated, Plaintiffs' conduct in making complaints to USPS management and EEO officers was permissible (and perhaps privileged) and Griffin has offered no evidence, other than his own bald assertions, that the purpose of Plaintiffs' complaints was to besmirch him. *See Conway v. Smerling,* 37 Mass.App.Ct. 1, 635 N.E.2d 268, 273 (Mass.1994) (upholding summary judgment on tortious interference with advantageous relations claim where the defendant "had a privilege, if not a duty, to speak the truth

25. There is also some merit to Plaintiffs' argument that their complaints of sexual harassment to Griffin's "supervisors," "other superiors of [USPS]" and "the [EEO] officer for [USPS]"—some which formed the basis of formal administrative complaints as well as for this action—are privileged. As Plaintiffs argue, an "absolute privilege" protects any allegedly "defamatory statements made 'in the institution or conduct of litigation or in conferences and other communications preliminary to litigation.' " *Sullivan v. Birmingham,* 11 Mass.App.Ct. 359, 416 N.E.2d 528, 530 (1981) (quoting *Sriberg v. Raymond,* 370 Mass. 105, 345 N.E.2d 882, 884 (1976)). In the court's estimation, that privilege might also extend, as here, to administrative proceedings as well to statements made in preparation of such proceedings. *See* 50 Am.Jur.2d *Libel and Slander* § 303 (1995) (citing cases). Moreover, Plaintiffs may possess a type of "qualified" privilege to publish allegedly defamatory material to their employer, such as "a conditional privilege 'where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it.' " *Foley,* 508 N.E.2d at 79 (quoting *Sheehan v. Tobin,* 326 Mass. 185, 93 N.E.2d 524, 528 (1950)). If so, the burden would be on Griffin "to prove that the statements were made recklessly," *id.* at 79–80, a burden he does not attempt to sustain.

even if the disclosure of the facts might negatively affect the [plaintiff]"). Accordingly, the court will recommend that Plaintiffs be granted summary judgment on these causes of action.

4. *Abuse of Process*

Griffin does not mention his abuse of process counterclaims in his opposition to Plaintiffs' motions for summary judgment. The court will treat these causes of action as abandoned and will recommend that Plaintiffs be granted summary judgment with respect thereto.

5. *Civil Conspiracy*

Finally, in each counterclaim, Griffin alleges civil conspiracy. "Civil conspiracy is recognized as a 'very limited cause of action in Massachusetts.' " *Brown v. Armstrong,* 957 F.Supp. 1293, 1305 (D.Mass.) (quoting *Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1563 (1st Cir.1994)) (further citation an internal quotation marks omitted), *aff'd,* 129 F.3d 1252 (1st Cir.1997). "It requires 'a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means.' " *Id.*(quoting *Maryland Cas. Co. v. Hosmer,* 93 F.2d 365, 366 (1st Cir.1937)). The plaintiff must also "show that the 'defendants, acting in unison, had some particular power of coercion over plaintiff that they would not have had if acting independently.' " *Id.* (quoting *Tennaro v. Ryder System, Inc.,* 832 F.Supp. 494, 499 (D.Mass.1993)). In addition, "[a]n unlawful or tortious act is a necessary requirement to a civil conspiracy claim." *Id.* (citations omitted).

In the case at bar, Griffin points to no summary judgment facts, other than the sketchy allegations made in the counterclaims themselves, which describe a civil conspiracy under Massachusetts law. At best he states in an affidavit that he "understand[s] that [Plaintiffs] conspired together to defame me, intimidate me, inflict severe emotional distress upon me, injure my reputation of [sic] and prevent my harmonious and continued employment with [USPS]." (Complaint I: Docket No. 73, Exhibit B ¶ 2.) In the court's view, such an unsubstantiated opinion is insufficient to sustain a civil conspiracy cause of action; that is, there must at least be some facts describing the existence and purpose of the cabal. *Cf. Slotnick v. Staviskey,* 560 F.2d 31, 33 (1st Cir.1977) (noting longstanding requirement that civil rights conspiracy allegations cannot survive "if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts"). In addition, as in *Brown,* Griffin's civil conspiracy counterclaims must fail because "there is no evidence that [Plaintiffs], separately or in combination, possessed any 'power of coercion' over [him]." *Id.,* 957 F.Supp. at 1305–06 (quoting *Tennaro,* 832 F.Supp. at 499). Finally, without any viable tort claim against Plaintiffs, there can be no civil conspiracy. *See id.* at 1305. The court will thus recommend granting Plaintiffs summary judgment on Griffin's civil conspiracy counterclaims.

## V. *CONCLUSION*

For the foregoing reasons, the court recommends as follows:

(1) that USPS's motions for summary judgment (Complaint I: Docket No. 62; Complaint II: Docket No. 31) be ALLOWED with respect to those portions of Counts I and II of Complaint I and Count I of Complaint II alleging Title VII retaliation and with respect to that portion Count I of Complaint I in which Kibbe claims a constructive discharge, but otherwise DENIED;

(2) that Griffin's motions for summary judgment (Complaint I: Docket No. 60; Complaint II: Docket No. 29) be AL-

LOWED with respect to Count III[sic] of Complaint I and Count II of Complaint, both of which allege malicious interference with employment, but otherwise DENIED; and

(3) that Plaintiffs' motions for summary judgment (Complaint I: Docket No. 64; Complaint II: Docket No. 33) be ALLOWED in toto.[26]

December 6, 2001.

**26.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.